THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PETER DUNUM, Defendant-Appellant.

First District (5th Division) No. 1—86—1360

Opinion filed March 31, 1989.

94

PINCHAM, J., specially concurring.

Howard Pomper & Associates, of Chicago (Ira Silbar, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Kenneth T. McCurry, Kim A. Novi, and Michael G. Cawley, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial defendant, Peter Dunum, was convicted of voluntary manslaughter (Ill. Rev. Stat. 1985, ch. 38, par. 9—2) in the stabbing death of his stepson, Willie Nolan. Defendant was sentenced to 14 years' imprisonment and was fined $1,000.

On appeal, defendant raises the following points in favor of reversal: the trial court prevented defendant from presenting exculpatory evidence of self-defense; the trial court improperly denied defendant's motion for mistrial regarding a question put to defendant on cross-examination; the trial court improperly denied defendant's motion "of acquittal and/or new trial"; the trial court improperly precluded, in granting a State motion *in limine*, evidence of statements made by defendant to the police; the trial court improperly precluded cross-examination of the State's pathologist regarding needle tracks on the victim's body and of the victim's blood-alcohol level; the trial court failed to properly inform prospective jurors regarding defendant's defense and to inquire of them their attitudes respecting that defense; the trial court improperly denied defendant's tendered jury instructions; the trial court improperly allowed the State to cross-examine defendant on an inflammatory matter not in evidence; the State failed to prove the elements of voluntary manslaughter by the requisite degree of proof; and the evidence did not prove defendant guilty beyond a reasonable doubt.

We affirm.

We summarize below testimony pertinent to our disposition.

Norma Dunum, defendant's wife of 16 years, testified that she and her husband lived at 4037 West Adams Street in Chicago in a three-story building owned by defendant. The victim, Willie Nolan, her son by a previous marriage, lived in the basement of the building. Norma testified that early in the morning of February 1, 1985, she, her niece, and her brother returned home from a nearby tavern. The defendant had also been at the tavern with them.

Norma stated that, while they and other family members were in the kitchen, an argument ensued between defendant and the victim over replacement of a telephone pager which had melted when the victim placed it on a heater. Norma testified that the defendant told the victim to go downstairs. The victim did so, taking a plate of food with him. Norma stated that the defendant then got up, walked to the

doorway to the stairs to the basement, and said, "I'll kill you, punk." Defendant went over to a kitchen drawer, pulled out a butcher knife, and went downstairs. Norma followed the defendant.

In the basement, defendant called the victim names and threatened him. At one point, the victim told defendant he wanted to call the police. Norma testified that defendant slapped the victim and continued to taunt him. At some point, the defendant pushed the victim and, as the victim staggered back, defendant approached. Norma stated the defendant still had the knife in his hand. She testified she positioned herself between the two men and begged defendant to return upstairs. Defendant, however, pushed her out of the way. At that point, the victim told the defendant to "do what he was going to do," and defendant stabbed the victim with the butcher knife. Norma stated the victim did not threaten the defendant at any time. After defendant stabbed the victim, she tried to push defendant upstairs. Norma stated that, before going, defendant told the victim, "If you come upstairs, I'm going to kill you." Eventually, paramedics were summoned to take the victim to a hospital.

On cross-examination, Norma admitted that after defendant said he was going to kill the victim, the victim told him to "come on" downstairs. She also admitted that the argument in the basement involved yelling and shouting by both the defendant and the victim. However, she stated that the victim never touched the defendant.

Frank and Annette Batte, Norma Dunum's nephew and niece, also testified they were in the kitchen on February 1, 1985. They similarly recounted the argument leading to defendant going downstairs with the knife. Both added that when defendant returned upstairs he washed blood off the knife in the kitchen sink.

Chicago police officer Leon Portillo testified that at approximately 3 a.m. on February 1, 1985, he was in his squad car and responded to a radio assignment to proceed to 4037 West Adams Street, about four blocks away from his, then, present location. Portillo was in the second of two squad cars proceeding westbound on Adams Street when they encountered defendant, who was walking eastbound on the sidewalk. Portillo stated that he noticed defendant because the defendant was not wearing a coat even though it was very cold. Both squad cars stopped and Portillo and another officer approached the defendant. Portillo testified that in response to the other officer, defendant stated, "[T]hey said I stabbed somebody." The officers put defendant in the back of a squad car and proceeded to 4037 West Adams Street. There, Portillo stated, Frank Batte told the officers that defendant had stabbed the victim. Portillo inspected the scene, retrieved the

knife, and summoned police detectives.

On cross-examination, Portillo admitted that when the police first encountered defendant as he was walking eastbound on Adams, defendant did not run and, instead, came over to the officers when they called to him.

Yuksel Konacki, an assistant Cook County medical examiner, was qualified as an expert and testified as to the autopsy he performed on the victim. Konacki stated that the victim was killed by a single stab wound, 5½ inches deep, to the area of the victim's left shoulder and chest, which penetrated over one inch into the left lung.

Peter Dunum testified on his own behalf. Defendant testified that at approximately 7:30 p.m. on January 31, 1985, he went down to a tavern to meet his wife and family and returned home for the evening with them at approximately 2 a.m. the following morning. After arriving home, defendant testified, they were all sitting at the kitchen table. The victim was also present. Defendant stated that his wife's niece had brought attention to the melted telephone pager. When the victim offered defendant's wife $0.50 for its replacement, an argument ensued between defendant and the victim. Defendant stated that he told the victim, "Instead of us arguing, you go on downstairs." Defendant stated that the argument became heated.

As the victim was going downstairs, the defendant got up and picked up a knife off of a counter. Defendant testified that the victim called to him to come downstairs. Defendant went downstairs with the knife in his hand. Defendant stated that when he arrived in the basement, he saw the victim reach from under a mattress with his right hand and put that hand in his pocket. Defendant stated that he did not see what the victim had in his hand. Defendant's wife was also present.

Defendant stated that he and the victim were standing face to face. The victim was pointing in defendant's face with his left hand. The victim's right hand was in his pocket. Defendant stated that the victim threatened to call the police and began to walk out of the room, but turned and came back toward defendant. The victim still had his right hand in his pocket. Defendant testified that the victim pushed defendant with his left hand and said, "I don't need no police, I will be my own police," and told defendant he would "blow [defendant] away." Defendant stated that when the victim began to remove his right hand from his pocket, defendant stabbed him. Defendant went upstairs. Defendant testified that shortly thereafter, he went downstairs and, seeing the victim's condition, went outside and ran down Adams Street to hail police. Defendant stated that he saw a po-

lice car and called to the officers to stop. The police drove him back to 4037 West Adams Street.

Defendant also testified that he was aware the victim had previously been convicted of armed robbery and robbery. Defendant also stated he had seen the victim with a gun about three weeks before the incident at issue.

On cross-examination, defendant admitted that while he knew of the victim's prior offenses, he permitted the victim to live in the building. Defendant stated that during the argument with the victim in the basement, the victim at all times kept his right hand in the pocket of his pants. Defendant never saw what was in the victim's right hand, nor did he see the victim's right hand ever come completely out of his pocket. Defendant also admitted saying that he intended to beat the victim, but denied saying that he intended to kill the victim. Defendant stated that even after he stabbed the victim in the left shoulder, the victim did not take his right hand out of his pocket but held his left shoulder with his left hand.

The parties stipulated that, if Michael I. Shaper, an expert toxicologist, were called as a witness, he would testify that tests on the victim's blood, urine, and bile indicated the presence of alcohol and that further tests on fluid samples were negative for the presence of various other narcotics.

Norma Dunum was called by the State to testify as a rebuttal witness. Norma stated that, while she was in the basement during the continuing argument between defendant and the victim, she never saw the victim put his hands in his pockets and, at the time defendant stabbed the victim, the victim's hands were at his sides.

Opinion

■■ Initially, we note that three of the points cited by defendant for reversal are not addressed in the argument section of defendant's opening brief, and we therefore decline to consider their relative merits. Defendant does not anywhere identify any purported exculpatory evidence of self-defense that he asserts the trial court did not allow him to present. Similarly, defendant's brief presents no argument and cites no authority in support of contentions that denial of his motion for mistrial violated his due process rights or that denial of his motion "of acquittal and/or new trial" constituted error. Absent the bare statement of those specific contentions in the section of defendant's opening brief enumerating points supporting reversal, defendant does not address those issues in the brief's argument section. As those issues have not been properly addressed in defendant's brief, we con-

clude they have been waived on appeal pursuant to Supreme Court Rule 341(e) (107 Ill. 2d R. 341(e)). *Williams v. Danley Lumber Co.* (1984), 129 Ill. App. 3d 325, 472 N.E.2d 586.

We consider first whether the trial court properly precluded evidence of statements made by defendant to the police.

At the close of its case in chief, the State moved to preclude testimony as to any oral or written statement of defendant in response to questions pertaining to any statement made by defendant to police. Defendant's counsel objected, pointing out that the State had been permitted to elicit testimony of defendant's statement to police officers called to the scene. Counsel argued that if such testimony was not allowed, the jury would incorrectly infer that defendant had related nothing to police in the way of an explanation. Defendant urged the court to allow that testimony at least to establish defendant's willingness to answer questions put to him at the police station.

The trial court, however, refused to permit testimony of defendant's exculpatory statements, explaining that the State was allowed to present testimony of defendant's initial statement to police because it was a statement by defendant against his own interest. The court further stated that establishing defendant's willingness to answer questions later was irrelevant and, in the absence of testimony as to the nature of the statements, would mislead the jury. The court also pointed out that defendant's initial statement to police, that defendant had stabbed somebody, was consistent with defendant's trial defense since defendant did not deny that fact, but relied on a theory of justification.

Generally, trial courts are expected to guard against unduly restricting a defendant's case in granting a motion *in limine* brought by the State, and a reviewing court will not, therefore, reverse a trial court's grant or denial of a motion *in limine* absent an abuse of discretion. (*People v. Downey* (1987), 162 Ill. App. 3d 322, 515 N.E.2d 362.) We find no such abuse present in the instant case. First, any statement made by defendant of an exculpatory nature while in police custody would constitute inadmissible hearsay, the contents of which would be properly excluded by the trial court. (See *People v. Visnack* (1985), 135 Ill. App. 3d 113, 481 N.E.2d 744.) Further, we are convinced that the trial court properly precluded testimony to show defendant's willingness to cooperate with police. We consider that evidence irrelevant and determine that its preclusion could not conceivably restrict defendant from establishing a theory of self-defense. We agree with the court below that defendant's initial statement that he stabbed somebody is consistent with defendant's theory of self-de-

fense and was otherwise properly admissible as a statement against interest. We further agree that testimony establishing that defendant later gave a statement to police, without eliciting its contents, would tend to mislead the jury that other evidence, favorable to defendant, existed but was being withheld from the jury's consideration.

We next consider whether the trial court properly limited the cross-examination of Yuksel Konacki.

During cross-examination of Konacki, the State posed an objection, in the nature of a motion of *in limine*, to prohibit the defense from questioning Konacki as to both the presence of needle tracks on the victim's body and the victim's blood-alcohol level. The State argued that the presence of needle track marks was irrelevant and that testimony pertaining to the victim's blood-alcohol level was beyond Konacki's field of expertise as a pathologist. The State pointed out that the parties were prepared to stipulate to the amounts of alcohol present in the victim's body as determined by a toxicologist (and later, at trial, did so).

The court so limited cross-examination.

Defendant contends the trial court's decision was erroneous and argues that evidence of needle track marks and the victim's blood-alcohol level indicated a propensity for violence. Defendant directs attention to *People v. Crump* (1955), 5 Ill. 2d 251, 125 N.E.2d 615.

We conclude the cross-examination was properly limited. Questions pertaining to both the victim's blood-alcohol level and to the existence of needle track marks on the victim's body were well beyond the scope of the direct testimony of Konacki, a pathologist, who testified only as to the cause of the victim's death. Moreover, evidence tending to show a victim's propensity for violence is only properly admissible once a foundation for such evidence is laid by introduction of evidence of self-defense. (*People v. Allen* (1972), 50 Ill. 2d 280, 278 N.E.2d 762.) No such foundation for that testimony had been established at the time Konacki testified. Lastly, the decision in *Crump* provides no support for defendant's position as the issue there, whether an accomplice witness' credibility can be properly challenged by evidence of that witness' drug addiction, bears no relation to any issue present here.

We turn to defendant's contentions on appeal that the trial court failed to properly inform prospective jurors regarding defendant's defense and to inquire of them their attitudes respecting that defense.

Prior to commencement of *voir dire*, defendant's counsel requested the trial court to ask the following questions of potential jurors regarding defendant's defense:

"1. Do you believe that a person should have the right to kill another person whom he reasonably believes is about to inflict great bodily harm on him?

2. Do you believe you could find Pete Dunum not guilty if you had a reasonable doubt about whether he acted in self-defense?

3. Some people honestly and legitimately believe that no person should ever kill another person even if their own life is in danger. How do you feel about that?

4. Could you in good conscience follow the law that requires you to acquit Pete Dunum if you have a reasonable doubt about whether or not he acted in self-defense?

5. If after hearing all of the evidence you have a reasonable doubt about whether or not Pete Dunum acted in self-defense would you hesitate to sign a not guilty verdict? Why do you say that?"

The trial court declined to ask the above questions, stating that such would amount to an inquisition of the jurors.

■ Supreme Court Rule 234 permits circuit courts broad discretion in conducting and managing *voir dire*, including the determination of whether to allow a party to submit additional questions to the court for further inquiry of the jurors, but prohibits direct or indirect questioning concerning matters of law or instructions. (107 Ill. 2d R. 234.) Thus, we have observed many times in the past that "[*v*]*oir dire* may not be used as a vehicle for pre-educating and indoctrinating prospective jurors as to a particular theory or defense or impanelling a jury with particular predispositions." *People v. Phillips* (1981), 99 Ill. App. 3d 362, 369, 425 N.E.2d 1040, 1046.

■ As each of the questions offered by defendant's counsel related, essentially, to the proper application of law concerning self-defense, we conclude the trial court was correct to decline to put those questions to prospective jurors. The record shows that the trial court otherwise conducted proper *voir dire*, including an inquiry of each prospective juror whether a decision by defendant to not testify would prejudice their deliberations.

We next consider defendant's arguments pertaining to jury instructions.

Defendant contends it was error for the trial court to decline to accept six jury instructions and a jury verdict form tendered by defense counsel. Two of the instructions were standard Illinois Pattern Jury Instructions pertaining to the crime of voluntary manslaughter based on serious provocation. Two non-pattern instructions were of-

fered by defendant's counsel pertaining to the law of self-defense. Defendant's counsel also offered two standard Illinois Pattern Jury Instructions pertaining to the crime of involuntary manslaughter. The offered verdict form related to a finding for that offense.

We cannot say that the trial court's refusal to give the instructions and to submit the verdict form to the jury constituted error.

As to the instructions pertaining to voluntary manslaughter based on provocation, we note that the State offered, and the trial judge accepted without objection of defendant, an instruction concerning voluntary manslaughter based on unreasonable belief in the necessity of self-defense. We have previously observed that, although it is permissible to instruct the jury as to both types of voluntary manslaughter, it is not error to refuse to give an instruction on the provocation theory, in addition to the unnecessary belief in justification theory, where the defendant testifies only that he acted in self-defense. (*People v. Bailey* (1986), 141 Ill. App. 3d 1090, 490 N.E.2d 1334.) Here, the defendant did not testify that the killing resulted from any sudden and intense passion provoked by the victim. Rather, defendant testified that he stabbed the victim because the victim allegedly made a motion to remove his right hand, in which defendant believed he held a weapon, from the pocket of his pants.

For similar reasons, instructions corresponding to the verdict form for involuntary manslaughter were unwarranted because evidence adduced at trial did not indicate the killing resulted from reckless conduct.

As to the refusal to give defendant's non-pattern instructions on self-defense, the record indicates that a standard Illinois Pattern Jury Instruction regarding self-defense was given by the trial court, without objection by defendant's counsel. We are satisfied that the instruction clearly explained the law regarding self-defense to the jury such that defendant's counsel's non-pattern instructions were unnecessary. See 107 Ill. 2d R. 451(a).

Lastly, during oral argument, defendant's appellate counsel directed the court's attention to the recent decision in *People v. Reddick* (1988), 123 Ill. 2d 184, 526 N.E.2d 141, a case not previously cited, urging its application here. We allowed supplemental briefs on the issue.

In *Reddick*, the supreme court considered two consolidated cases involving murder convictions. There, the supreme court ruled that if a defendant, in a trial for murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1), presents sufficient evidence of one of the alternative mitigating

mental states which would reduce the charge of murder to voluntary manslaughter, then, to sustain the murder conviction, the State must prove beyond a reasonable doubt that those defenses are meritless and must also prove, beyond a reasonable doubt, the statutory elements of murder. (*Reddick*, 123 Ill. 2d at 197, 526 N.E.2d at 146.) In reaching that determination, the court examined Illinois Pattern Jury Instructions on murder and voluntary manslaughter identical to those given in the instant case. The court concluded that when the two instructions were read together, they incorrectly stated applicable law regarding voluntary manslaughter by placing the burden of proof as to one of the alternative mitigating mental conditions on the State. (*Reddick*, 123 Ill. 2d at 194-95, 526 N.E.2d at 145.) The court reasoned that the instructions "essentially assure that, if the jury follows them, the jury cannot possibly convict a defendant of voluntary manslaughter" because, "even if a mitigating mental state is proved, it will have been proved by the defendant, not the People." (*Reddick*, 123 Ill. 2d at 194-95, 526 N.E.2d at 145.) The court concluded that the failure to properly instruct the jury as to the State's burden of proof constituted grave error requiring reversal because, when viewing the record as a whole, it appeared that the jury was not apprised of the State's burden of proof. *Reddick*, 123 Ill. 2d at 194-95, 526 N.E.2d at 145.

■ Although we are concerned that the instructions given below similarly failed, when considered together, to appropriately set out the burden of proof regarding existence of a mitigating mental condition for the offense of voluntary manslaughter, we have difficulty ascertaining how defendant here was prejudiced under the rationale of *Reddick*. The jury below returned a verdict of voluntary manslaughter, not murder. Thus, notwithstanding that the jury was improperly instructed as to which party had the burden to show defendant believed circumstances existed which justified the killing, the instruction properly required the State to disprove existence of that mental condition beyond a reasonable doubt, which, as the verdict indicates, the jury so determined. We therefore do not find a basis to disturb the jury's verdict under application of the holding of *Reddick. Cf. People v. Carter* (1988), 177 Ill. App. 3d 593, 532 N.E.2d 531.

Finally, we consider whether the State failed to prove the elements of voluntary manslaughter by proof beyond a reasonable doubt and that the verdict was against the weight of the evidence.

■ ■ Relevant here, a person commits voluntary manslaughter if he intentionally or knowingly kills an individual believing the circumstances justify or exonerate the killing, but his belief is unreason-

able. (Ill. Rev. Stat. 1985, ch. 38, par. 9—2; *People v. Fausz* (1983), 95 Ill. 2d 535, 449 N.E.2d 78.) It is the function of the jury to determine whether the State has met its burden of proving defendant guilty of the crime charged beyond a reasonable doubt. (*People v. Smith* (1985), 139 Ill. App. 3d 21, 25, 486 N.E.2d 1347, 1349.) A determination that the State has met that burden will be reversed only if the evidence is so improbable, impossible, or unsatisfactory as to raise a reasonable doubt of defendant's guilt. (*Smith*, 139 Ill. App. 3d at 25, 486 N.E.2d at 1349.) A single witness' testimony, if positive and the witness credible, is sufficient to convict, even though the testimony is contradicted by the accused. *People v. Glover* (1971), 49 Ill. 2d 78, 273 N.E.2d 367.

 Norma Dunum's testimony, alone, was sufficient to convict defendant. At trial, Norma Dunum, defendant's wife and mother of the victim, witnessed and testified to every aspect of the incident from the onset of the argument in the upstairs kitchen to its culmination in the stabbing in the basement apartment. Although defendant testified that he stabbed the victim in self-defense, implying that defendant believed the victim was holding a weapon in his pocket, Norma stated that the victim at no time threatened defendant and at all times had his hands outside of his pockets. Defendant's contrary testimony presents, at most, an issue as to credibility which we may not properly consider in our limited determination of whether the evidence is sufficient for the trier of fact to find defendant guilty beyond a reasonable doubt. (*People v. Hendricks* (December 21, 1988), No. 63803.) Because we determine Norma Dunum's testimony was sufficient for that purpose, we affirm the judgment below.

Affirmed.

MURRAY, P.J., concurs.

JUSTICE PINCHAM, specially concurring:
I agree with the defendant's contention on this appeal that the trial court erred when it denied the defendant's request that the trial court, during *voir dire* examination of the prospective jurors, inform the jurors that the defendant's defense to the murder charge was self-defense, and when it refused to inquire of and determine from the jurors if their attitudes and opinions about self-defense would (1) cause them to reject self-defense as a defense, (2) prejudice or taint their judgment, or (3) impair their ability to serve fairly and impartially as jurors. Because, however, of the hereinafter discussed circumstances of this case, the errors were harmless. I therefore concur in the af-

firmance of the defendant's conviction.

Illinois Supreme Court Rule 234 (107 Ill. 2d R. 234) provides:

> "The court shall conduct the *voir dire* examination of prospective jurors by putting to them questions it thinks appropriate touching their qualifications to serve as jurors in the case at trial. The court may permit the parties to submit additional questions to it for further inquiry if it thinks they are appropriate, or may permit the parties to supplement the examination by such direct inquiry as the court deems proper. Questions shall not directly or indirectly concern matters of law or instructions. The court may acquaint prospective jurors with the general duties and responsibilities of jurors."

Rule 234 is mandatory. It requires that the court *shall* put questions to the prospective jurors touching their qualifications to serve as jurors *in the case on trial.* The purpose of *voir dire* examination is to obtain 12 jurors who will be fair and impartial to both the State and the defendant, and who will in open court commit themselves and solemnly swear to do so. *Voir dire* examination is not designed to obtain a jury composed of any numerical combination of pro or anti State or defense jurors. It is the purpose of *voir dire* examination of prospective jurors to select 12 persons who will completely cast aside and be uninfluenced by any bias or prejudice that they may have and render a verdict based solely on the law and the evidence. Neither the State nor the defendant should be advantaged or disadvantaged, and both sides should be treated fairly and equally during and by *voir dire* examination.

To achieve these magnanimous and grandiloquent, but nevertheless easily attainable goals, and to comply with the *voir dire* examination rule, *in the case on trial,* it is obviously necessary to inform the prospective jurors of the offense, the nature and ingredients of the offense that the defendant is alleged to have committed, for which the defendant is on trial, and on which the jury will render its verdict. Prospective jurors may have different attitudes, ideas, concepts, biases and prejudices about different offenses that may adversely affect their ability to be fair. These varying attitudes can be discerned and determined by informing the jury of the offense for which the defendant is on trial and on which they will sit in judgment, and by appropriate inquiries of them and their honest responses thereto concerning their attitudes about such an offense.

The same is true of a defendant's defense, in the instant case, self-defense. Some prospective jurors may have certain fixed notions, biases and even prejudices regarding self-defense that impair, and

with some, which actually preclude, their ability to be fair and render a just verdict according to the law and the evidence. Such jurors and such attitudes can be detected by informing them that the defendant's defense is self-defense, just as they should be informed of the offense the defendant is alleged to have committed. Then, appropriate and adequate inquiry should be made by the trial court or counsel of each of the prospective jurors regarding any attitude, concept, bias or prejudice that he or she may have about such a defense that would hamper his or her ability to be fair and just.

General inquiry to the entire venire of whether they will follow the law as given them by the court in the form of instructions to the jury is grossly inadequate, insufficient, and indeed inappropriate to fulfill the foregoing solemn responsibilities of *voir dire* examination and the ultimate selection of 12 informed fair, impartial and unbiased jurors. A simple question to the venire jointly, or individually for that matter, of if they will be fair, and their typical favorable animated responses, are inadequate and fail to fulfill the grave mandate of Rule 234. I do not intend to suggest that the *voir dire* inquiry subjects should be limited to the offense charged and the defense thereto. Quite the contrary. Rule 234 requires that a sincere and dedicated effort be made, by extensive inquiry of the prospective jurors, whether there is an indication that such is needed, and that their answers thereto be assessed, in properly selecting an unbiased and fair jury. Simple perfunctory interrogation will not suffice.

Jurors or a jury are not and should not be the clones of the trial judge, the prosecutor or the defense attorney. Jurors and a jury are and should be the clones and conscience of a fair, impartial and just community. Jurors and a jury are the bulwark between a tyrannical, abusive government and the endeared and valued rights that a free people demand and enjoy. It is inspiringly beneficial to occasionally historically reflect on this precious and ancient right to a trial by jury. That great charter of liberty, the Magna Carta, issued by King John on June 15, 1215, provides, *inter alia*:

> "Know ye that we, unto the Honour of Almighty God, and for the salvation of the souls of our progenitors and successors Kings of England, to the advancement of holy Church, and amendment of our Realm, of our meer and free will, have given and granted to all Archbishops, Bishops, Abbots, Priors, Earls, Barons, and *to all free-men of this our realm, these liberties following, to be kept in our kingdom of England for ever.*
>
> &ast; &ast; &ast;
>
> *No Freeman shall be taken, or imprisoned, or be disseised*

*of his Freehold, or Liberties* or free Customs, or be outlawed, or exiled, or any otherwise destroyed; *nor will we not pass upon him, nor condemn him, but by lawful Judgment of his Peers,* or by the Law of the Land. (2) We will sell to no man, we will not deny or defer to any man either Justice or Right." (Emphasis added.) Am. Jur. 2d *Desk Book,* item 194, at 784, 789 (1979).

Long before the Magna Carta, the jury and the ballot were described by Aristotle in 325 B.C. See The Athenian—Law Courts—Jury Ballots—and Democracy, History's First Jury Ballot, by Constantine N. Kangler, published by the National Greek Press Publishing Company, 1985.

The Unanimous Declaration of Independence of the Thirteen United States of America in Congress, July 4, 1776, provides in part here pertinent:

"The history of the present King of Great Britain is a history of repeated injuries and usurpations, all having in direct object the establishment of an absolute Tyranny over these States. To prove this, let Facts be submitted to a candid world.

\* \* \*

He has combined with others to subject us to a jurisdiction foreign to our constitution, and unacknowledged by our laws; giving his Assent to their acts of pretended legislation:

\* \* \*

For depriving us in many cases, of the benefits of Trial by Jury." Am. Jur. 2d *Desk Book,* item 186 at 750, 751 (1979).

This precious right to trial by jury is guaranteed in the Constitution of the United States and in the constitutions of every State of the Union. In this State, in the exercise of that right, the mandate of Rule 234 demands adherence. Compliance therewith can be accomplished and a fair, impartial and informed jury can be selected, without indoctrinating the jury to a particular disposition. The *voir dire* examination and the jury selection process should not be pursued callously and insensibly, as indeed they were in the case at bar.

Pursuant to Rule 234, the defense attorney tendered the following questions to and for the trial court to question the jurors on *voir dire* examination their attitudes regarding self-defense:

"VOIR DIRE QUESTIONS
SUBMITTED BY THE DEFENSE

1. Do you believe that a person should have the right to kill another person whom he reasonably believes is about to inflict great bodily harm on him?

2. Do you believe you could find Pete Dunum not guilty if you had a reasonable doubt about whether he acted in self-defense?

3. Some people honestly and legitimately believe that no person should ever kill another person even if their own life is in danger. How do you feel about that?

4. Could you in good conscience, follow the law that requires you to acquit Pete Dunum if you have a reasonable doubt about whether or not he acted in self-defense?

5. If after hearing all of the evidence, you have a reasonable doubt about whether or not Pete Dunum acted in self-defense would you hesitate to sign a not guilty verdict? Why do you say that?"

Upon tendering the foregoing proposed *voir dire* questions, the defense attorney stated to and requested of the trial court:

"Judge, we have prepared a list of fairly brief suggested questions that we would like to ask about certain areas, * * * we are nevertheless, making the request that you ask the questions on that particular list of the potential jurors."

The trial court denied the defense attorney's request in the following language:

"We will not ask any of these questions *in the form in which they are proposed. This would amount to a grilling of each juror, and amount to an inquisition* which would make the citizens who are summoned here to serve as jurors very uncomfortable. They wouldn't expect to be cross examined in depth in [this] manner, so we will not ask these questions." (Emphasis added.)

The mental gymnastics via which the trial court arrived at the conclusion that asking the proffered questions on *voir dire* examination of the prospective jurors would "amount to an inquisition" is not discernible from the record on appeal before us. Nevertheless, that conclusion was baseless, unless of course the trial court lacked the simple and rudimentary skills to tactfully and courteously inquire of the jurors without *grilling* them, seemingly basic qualities possessed by any, or even the most inexperienced, trial judge.

The trial judge stated that it refused to ask the defense attorney's proposed *voir dire* examination questions *"in the form in which they are proposed."* (Emphasis added.) Although it is clear that the questions were intended to inquire of the prospective jurors about their attitudes on self-defense, it is equally clear that the questions were confusing. To describe the questions as inartfully drawn would be a

gratuitous understatement. For these reasons the trial judge was justified in refusing to put to the prospective jurors the questions *"in the form in which they are proposed."* (Emphasis added.) The trial judge was not warranted, however, in refusing to ask the questions for the reasons it stated in so doing, *i.e., "This would amount to a grilling of each juror, and amount to an inquisition* \*\*\*." (Emphasis added.)

The trial court's expressed rejection of the questions "in the form on which they are proposed" was a clear indication and should have prompted the defense to redraft and resubmit the questions in proper form, but he did not do so. At the very least, the trial judge's expressed rejection of the defense attorney's proposed questions should have triggered an inquiry by the defense attorney to the trial judge about what was wrong with the proposed questions so that counsel could correct them. But it did not do so and he did not do so. Instead, the defense attorney simply abandoned pursuing the issue, and, in my judgment, he should not have done so.

As before stated, the command of Rule 234 is that "[t]he court *shall* conduct the *voir dire* examination of prospective jurors by putting to them questions it thinks appropriate touching their qualifications to *serve as jurors in the case [at bar]."* (Emphasis added.) (107 Ill. 2d R. 234.) Thus, the trial court was under an affirmative duty, on its own, to make appropriate inquiry of each of the prospective jurors if he or she had or entertained any bias or improper attitudes concerning a charge of murder or a defense thereto of self-defense that would impair his or her ability to fairly and justly serve as jurors. The trial court did not comply with the command of Rule 234, and the trial court clearly erred in not doing so.

Simultaneously with the submission of the foregoing questions by the defense attorney for the trial court's *voir dire* examination of the jurors regarding the defense of self-defense, the defense attorney also presented to the trial court additional proposed *voir dire* questions of the jurors regarding the defendant's testimony and the defendant's right not to testify. The questions were as follows:

"II Defendant's Testimony

1. If Mr. Dunum chooses not to take the stand, how do you think that might affect your judgment?

2. Would you expect Pete Dunum to take the stand? What would you think if he doesn't?

3. If Pete Dunum chooses not to take the stand in his own defense, would that fact tend to make you think he was guilty?

4. If Pete Dunum does take the stand and testifies, do you think you could judge his testimony by the same standards you

would use in judging any other person's testimony?

 5. If Mr. Dunum chooses to take the stand, would the fact that he is the defendant here tend to make you automatically reject his testimony?''

Upon submission of these immediate foregoing questions, and to persuade the trial court to ask them of the jurors, the defense attorney stated to the trial court, "I can't positively tell you whether he will take the stand. In any event, I think that is important information for us to know, if somebody would accept his testimony or reject his testimony just because he is the defendant, even if we choose not to put him on the stand. *** I think it is important for us to know if in fact they would draw some inference from his failure to take the stand." The trial judge responded, "We will cover that point."

The trial court did not disclose the distinction it discerned between the defense attorney's proposed *voir dire* questions on self-defense, which it thought if asked would have been a "grilling" and an "inquisition," and the defense attorney's proposed *voir dire* questions on the defendant's testimony and right not to testify, which, when asked, did not also constitute a "grilling" or an "inquisition."

The majority in the case at bar treats the proposed *voir dire* questions on self-defense and on the defendant's testimony and right not to testify as though these two subject areas were the same, *i.e.*, as though the trial court's *voir dire* inquiry to the jurors on one, *i.e.*, the defendant's testimony and right not to testify, excused and justified the trial court's refusal to inquire of the jurors on the other, *i.e.*, self-defense. In rejecting the defendant's contention on this appeal that the trial court erred in not inquiring of the jurors on their *voir dire* examination and in not determining that these attitudes regarding self-defense would not impair their ability to properly serve as jurors in the case, the majority states, "[a]s each of the questions offered by defendant's counsel related, essentially, to the proper application of law concerning self-defense, we conclude the trial court was correct to decline to put those questions to prospective jurors. The record shows that the trial court otherwise conducted proper *voir dire*, including an inquiry of each prospective juror whether a decision by defendant to not testify would prejudice their deliberations." 182 Ill. App. 3d at 101.

I do not agree with this assessment. The trial court did not ask a single juror during the entire *voir dire* examination a single question on self-defense. Nor did the trial court inform the jury during *voir dire* that the defendant was charged with murder. After the trial court's *voir dire* inquiry, the defense attorney did not renew his re-

quest that the trial court inquire of the jurors their attitudes on self-defense. He should have done so. The case went to the jury, which deliberated to a verdict without the trial court or counsel knowing whether any one of them possessed an attitude or bias against murder or self-defense which would preclude their ability to serve fairly and impartially. In my judgment, this was error. However, based on the charge of murder for which the defendant was on trial, the State's evidence, the defendant's evidence of self-defense, the trial court's instructions to the jury on murder, self-defense and voluntary manslaughter and the jury's verdict of guilty of voluntary manslaughter, it is quite apparent that the error was clearly harmless.

The two-count indictment alleged that on February 1, 1985, the defendant Peter Dunum committed the offense of murder (1) "in that he, without lawful justification intentionally and knowingly stabbed and killed Willie Nolan with a knife" and (2) "in that he, without lawful justification stabbed and killed Willie Nolan with a knife knowing that such stabbing with a knife created a strong probability of death or great bodily harm to Willie Nolan."

The State's trial evidence established that the defendant and the victim, Willie Nolan, the defendant's stepson, quarreled while in the former's apartment. The victim departed for his own apartment in the basement, followed by the defendant with a butcher knife in his hand that he had just pulled out of a kitchen drawer. The defendant and the victim continued their quarrel in the victim's apartment, where, according to the defendant's wife, mother of the victim and a State's witness, the defendant fatally stabbed the unarmed, non-threatening victim. Conversely, it was the defendant's contention that, out of fear for his own safety and to protect himself from bodily harm from the victim, he stabbed the victim when the victim began to remove his concealed right hand from his pocket while simultaneously stating that he would blow the defendant away. Thus, there was presented to the jury the ultimate issue of the credibility of the victim's mother and defendant's wife against the credibility of the defendant.

Without objection from the defendant, and at the request of the State, the trial court instructed the jury that "the defendant is charged with the offense of murder which includes the offense of voluntary manslaughter." The trial court also instructed the jury on the definition and issues of murder, which need not be repeated here inasmuch as the jury did not find the defendant guilty of murder, but found him guilty of voluntary manslaughter.

The trial court gave the State's tendered instruction on self-defense, as follows: "A person is justified in the use of force when and

to the extent that he reasonably believes that such conduct is necessary to defend himself against the imminent use of unlawful force. However, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself." At the defendant's request, the trial court instructed the jury that "for a person to lawfully act in self-defense, it is not necessary that the danger be real, it is enough if the defendant had reasonable grounds to believe himself in danger of losing his life or suffering great bodily harm if the danger is only apparent."

The trial court instructed the jury on voluntary manslaughter and the issues on voluntary manslaughter, as follows:

"A person commits the offense of voluntary manslaughter when he kills an individual if, in performing the acts which cause the death,

he intends to kill or do great harm to that individual; or

he knows that such acts will cause death to that individual; or

he knows that such acts create a strong probability of death or great bodily harm to that individual;

and at the time of the killing he believes that circumstances exist which would justify the deadly force he uses, but his belief that such circumstances exist is unreasonable.

\* \* \*

To sustain the charge of voluntary manslaughter, the State must prove the following propositions:

*First* That the defendant performed the acts which caused the death of Willie Nolan; and

*Second* That when the defendant did so, he intended to kill or do great bodily harm to Willie Nolan; or he knew that his acts would cause death or great bodily harm to Willie Nolan; or

he knew that his acts created a strong probability of death or great bodily harm to Willie Nolan; and

*Third* That when the defendant did so he believed that circumstances existed which would have justified killing Willie Nolan; and

*Fourth* That the defendant's belief that such circumstances existed was reasonable.

*Fifth* That the defendant was not justified in using the force which he used.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a rea-

sonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty.''

As previously stated, the jury found the defendant guilty of voluntary manslaughter. It is obvious that the jury accepted the defendant's testimony that he stabbed the victim in self-defense, clearly demonstrating thereby that none of them had any bias or adverse attitudes toward the defense of self-defense which impaired their ability to be fair and impartial or to base their verdict on the law and the evidence. Inasmuch as the defendant directly admitted that in self-defense he performed the acts which caused the death of Willie Nolan, and inferentially admitted that when he did so he intended to kill or do great bodily harm to him, it is apparent from the jury's voluntary manslaughter guilty verdict that the jury concluded and found beyond a reasonable doubt that: (1) the defendant "believed that circumstances existed which would have justified killing Willie Nolan"; (2) "that the defendant's belief that such circumstances existed was unreasonable"; and (3) "the defendant was not justified in using the force which he used." These foregoing conclusions and finding of the jury become unequivocally fortified and nondebateable by the jury's obvious rejection of the testimony of the State's witness and mother of the deceased, from which the jury easily could and would have concluded the stabbing was murder had they chosen, to believe her. The jury accepted the defendant's testimony of self-defense, that he believed the circumstances were such that justified his killing of the deceased, but the jury rejected that his belief was reasonable and that the amount of force he used was justified. The conclusion is inescapable that the trial court's error in failing to properly question the jurors on the *voir dire* examination on their possible bias or adverse attitudes regarding self-defense in the case on trial was harmless error. (*People v. Moore* (1983), 95 Ill. 2d 404, 409-12; *People v. Jones* (1979), 81 Ill. 2d 1, 7-10.) Accordingly, I concur in the judgment of the court affirming the defendant's conviction and 14 years' imprisonment sentence for voluntary manslaughter.