THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DEMETRIUS THOMAS, Defendant-Appellant.

First District (2nd Division)   No. 1—92—3757

Opinion filed September 20, 1994.

Rita A. Fry, Public Defender, of Chicago (James S. Jacobs, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and James E. Fitzgerald, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SCARIANO delivered the opinion of the court:

Defendant, Demetrius Thomas, shot and killed Richard Hillsberg while the two were in the midst of a struggle in an alley behind a tavern. At his bench trial, he maintained that he acted in self-defense. The court found that his fear for his safety, although genuine, was unreasonable; it therefore found him guilty of second-degree murder. Due to two earlier felony convictions, defendant was sentenced for this Class 1 offense within the range provided for Class X crimes. He accordingly received a sentence of 15 years.

At trial, the State presented the testimony of Michael McWherter, who stated that on February 8, 1991, he arrived at the Bonanza Lounge, located at the corner of Lawrence Avenue and St. Louis Avenue, with his long-time friend Richard Hillsberg and Nanette Forman. Prior to going to the lounge, McWherter, who had a previous conviction for burglary, and Hillsberg had spent the afternoon together, during which they each consumed around four or five cans of beer, an amount which McWherter described as "minimum." The autopsy of Hillsberg disclosed that at the time of death, his blood-alcohol level was .104 percent, which is above the legal allowable maximum level for the purpose of operating a motor vehicle.

As McWherter and his party were leaving the lounge, he saw three African-Americans seated at the bar, two men and a woman. Defendant, who was one of the males at the bar, was speaking to his friend and he gestured toward Nanette Forman as she walked past them toward the door.

Hillsberg asked defendant if he had a problem; defendant responded affirmatively. Defendant then suggested that the two go outside to resolve their dispute, something which Hillsberg agreed to do. The six people, Hillsberg, defendant and all of their companions, walked outside in file, and pursuant to defendant's friend's proposal, they went into the alley so as to avoid detection and interference by the police.

There, Hillsberg asked defendant, "What's up?" to which defendant answered by stating "I'll show you what's up." He then reached into his waistband, withdrew a pistol, which McWherter described as being big and black, about a foot in length, and hit Hillsberg in the face with it. Hillsberg's hands immediately went to protect his head, and he bent into a protective position, shielding his face from defendant.

In the next instant, defendant began firing the weapon at Hillsberg, who tried to flee. McWherter, who was running from the scene along with Hillsberg, heard three or four shots. As they ran, Hillsberg informed him that he had been struck by a bullet. McWherter

assisted Hillsberg into McWherter's car, and he noted that Forman was waiting for them in the back seat. They drove down the alley where the shooting took place and saw defendant as he ran toward their car, still holding the pistol and aiming it at the vehicle. McWherter drove Hillsberg to the emergency room of a hospital, where he later died. According to the medical examiner, death was caused by multiple gunshot wounds.

During his cross-examination, McWherter admitted that his testimony regarding the events of the evening of the shooting did not strictly comport with the statement he gave police that night, but he blamed the multiple disparities and omissions on the fact that he was upset that night and because he feared for his own safety.

The State also presented the testimony of Vanessa Sanders. On February 9, 1991, she resided at the Ainslee Hotel with her mother and her ex-boyfriend, where she was a neighbor of defendant. That morning at about 2 o'clock, at which time she was accompanied by Sylvia Jones, she saw defendant entering the hallway of the hotel. Defendant told the two of them that he had shot Marcia, whom Vanessa assumed to be her acquaintance Marcia Samuels. She was also the woman whom McWherter had earlier described as defendant's female companion at the Bonanza Lounge.

Vanessa left the hotel and went to the Bonanza Lounge in an unsuccessful attempt to find Marcia. On her way back to her residence, she and three other friends were met again by defendant, who told them at that time that he had just been in an argument with two white men. He explained that after being verbally challenged by one of the men, he brandished his pistol, and the man pushed it. Defendant consequently struck him on the side of his face with the weapon, causing it to discharge. That round struck Marcia, according to defendant.

Marcia Samuels testified that on the night of the incident, she went to the Bonanza Lounge with defendant, where she estimated that the two each had one beer. At approximately 1:30 a.m., two white men and a white woman entered the lounge, approached her as she sat at the bar, and one of them made what was presumably a vulgar remark to her as they passed. She responded in kind, but defendant remained silent, apparently unaware that something had been said to her.

After she cursed him, the man who had harassed her left the bar, but returned soon thereafter. This time he confronted defendant, inquiring "what was he looking at." Defendant responded by asserting his right to look anywhere he pleased, and he suggested that the two take their disagreement outside. As McWherter had

testified, six people walked outside, defendant, Marcia, and their friend Colin, along with two white males and one white female, the three she had seen enter the bar together. She further corroborated McWherter's testimony that they proceeded into the alley before a fight began.

The men formed a loose circle, with defendant approximately 10 to 15 feet from Hillsberg. Once these positions were taken, events unfolded rapidly. First, defendant repeatedly asked his opponent "What's up, what's up?"; then he moved his hand, which held a pistol, toward the man's face. Marcia did not know whether it impacted there, for the gun discharged at some point on its arc toward its target. That round hit her and she fell to the ground, where she heard the report of two more rounds.

Detective Lawrence Halec spoke with Marcia in the emergency room of the hospital where she was taken for treatment. She provided him with a description of defendant, telling the detective that he had shot her. He then went to the 17th district stationhouse, where he saw defendant, who matched Marcia's description, standing in the lobby. Halec invited him into a nearby interview room and called other detectives working on the case who confirmed that he fit the physical profile of the individual they suspected of committing the shooting behind the Bonanza Lounge. Defendant was formally arrested and transported to Area 5 violent crimes.

Halec placed defendant in an interview room, advised him of his constitutional rights and received defendant's acknowledgement that he understood them. Defendant invoked his right to remain silent, but did deny having any responsibility in the crime Halec was investigating. A short time later, he was placed in a lineup where he was identified by McWherter as being Hillsberg's murderer.

During cross-examination, defendant sought to elicit from Halec the substance of his confession which had been taken by a court reporter at some point on the morning of his arrest. He had moved *in limine* to exclude it, contending vigorously that it was coerced and thus inadmissible, but after conducting an extensive hearing on the motion, which included the testimony of defendant, the two detectives and the assistant State's Attorney, all of whom were present when he provided the confession, the court denied his motion, concluding that the statement was voluntary.

After the State elected not to proffer the evidence, defendant, deeming it advantageous to his theory of the case, and notwithstanding his *in limine* objections to the confession, attempted to introduce it through Halec. The State objected and the court sustained the objection, refusing to condone what amounted to a clear hearsay use

of the evidence, *i.e.*, as tending to prove that when he fired his weapon, he did so out of fear for his own life.

Defendant offered the testimony of two individuals who had been battered by the victim in the past. According to both witnesses, those attacks by Hillsberg had been unprovoked. In addition, one of the individuals testified that he had pressed charges against Hillsberg, and when he went to court to testify at the preliminary hearing, Hillsberg threatened him. After the court found him guilty and sentenced him, defendant filed a timely notice of appeal, seeking review of both his conviction and sentence.

## I

■ In defendant's first assignment of error, he contends that the circuit court denied him his right to present a defense when it sustained the State's objection to his using as substantive evidence the colloquy he participated in with two detectives and an assistant State's Attorney. In that statement, which, as previously noted, he had moved *in limine* to suppress, he told the officials assembled that he shot Hillsberg; but he also stated there that Hillsberg, who appeared intoxicated, was the aggressor in their confrontation, and that he initially brandished the weapon in the hope that it would scare off Hillsberg, who, at the time of his death, was 5 feet 8 inches tall and weighed 158 pounds, while defendant was only 5 feet 2 inches and weighed 127 pounds. He maintains that this evidence corroborated the exculpatory admissions he made to the State's witnesses, Sylvia Jones and Vanessa Sanders, that he fired the weapon only because Hillsberg continued to approach him even though he had drawn the pistol and aimed it at him.

Defendant concedes that the statement is inadmissible hearsay. (See *People v. Jones* (1962), 26 Ill. 2d 300, 305, 186 N.E.2d 314, 317 (reiterating the rule that "self-serving conversations between the defendant and third parties subsequent to the commission of the crime are not competent evidence"); *People v. Young* (1990), 206 Ill. App. 3d 789, 811, 564 N.E.2d 1254, 1269 ("Generally, a defendant's out-of-court exculpatory statement is inadmissible hearsay because its relevance depends upon the truth *** or falsity of the matter asserted"); see also *People v. Lewis* (1979), 75 Ill. App. 3d 259, 393 N.E.2d 1098.) Nevertheless, he argues that the United States Supreme Court's landmark decision, *Chambers v. Mississippi* (1973), 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038, with its subsequent "extensions" in *Ohio v. Roberts* (1980), 448 U.S. 56, 65 L. Ed. 2d 597, 100 S. Ct. 2531, and *White v. Illinois* (1992), 502 U.S. 346, 116 L. Ed. 2d 848, 112 S. Ct. 736, dictate that the court suspend enforcement of this long-held rule of Illinois evidence in the case at bar.

Before delving into an analysis of *Chambers*, we deem it to be in the interest of clarity to consider the extension to its holding purportedly worked by *Roberts* and *White*. Defendant reads the combination of those decisions to stand for the proposition that a defendant is entitled to offer any hearsay statement in her defense so long as it carries with it a sufficient indicia of reliability. He maintains that those decisions signal an intent by the Court to no longer pay any regard, for the purpose of the defendant's presentation of evidence, to the unavailability of the declarant, or to the fact that the hearsay testimony will not be subject to cross-examination by the State.

However, in asserting that those decisions somehow enlarge upon *Chambers*, defendant misconceives the holding of those cases as well as that of *Chambers*. *Roberts* and *White* dealt with the question of when the State's attempted introduction of hearsay will violate the defendant's sixth amendment right to confront the witnesses against him. *White* held that where an out-of-court statement falls within a "deeply rooted" exception to the rule against hearsay, the State does not run afoul of the confrontation clause by introducing such declarations, even if the declarant is readily available to testify in person. This dethroned the theory which emerged in the wake of *Roberts* that to satisfy the confrontation clause, the State may have been required to demonstrate the unavailability of a declarant before it proffered any extrajudicial statements, even those which had been admissible since the inception of the rule.[1]

*Chambers*, on the other hand, considered the entirely different question of when a State's rule of evidence, barring, for example, a defendant's use of hearsay, so impedes his presentation of his case as

---

[1]Wigmore observes that it is impossible to fix with any certainty the years in which the classic exceptions to the rule were established. He ascribes this difficulty to the slow development of the rule itself, which did not surface in its current form until the early 1700's. He notes that even after the rule received wide application, certain classes of out-of-court statements were received as they had been before, without regard to the new prohibition on that type of evidence. By the 1800's, these statements came to be viewed officially as exceptions to the rule. (5 J. Wigmore, Evidence § 1426, at 256-57 (Chadbourn rev. ed. 1974).) Thus, Wigmore may be understood to have viewed the rule and many of its classic exceptions to be contemporaries. Yet Holdsworth, while crediting Wigmore as being the principal source for his retelling of the history of the rule, appears to have believed that the exceptions developed only after the rule was fully established and widely followed, at which point its deficiencies came to be appreciated. 9 William S. Holdsworth, A History of English Law 219 (1926).

to deprive him effectively of his vital right to defend himself. Since this is nearly the polar opposite of the issue raised in *White* and *Roberts*, there is no need for us to entertain any further arguments by defendant on those decisions. Accordingly, the resolution of the instant issue depends solely on whether or not the circuit court's exclusion of defendant's earlier statement is inconsistent with the holding of *Chambers*.

In *Chambers*, the defendant was arrested for the murder of a police officer. Before dying, the officer, Sonny Liberty, fired his riot gun into the alley from which the fatal shots were fired. One of the rounds struck and wounded the defendant. He was taken by friends to a hospital where he was arrested for Liberty's murder once the sheriff learned that he had survived the shotgun blast.

The defendant asserted his innocence, claiming that another man, Gable McDonald, actually did the killing. Some time after the shooting, McDonald told three of defendant's friends at three separate times that he committed the offense. One of the three persuaded him to make a formal confession to the defendant's attorney, which he did, describing the events of the crime in great detail. At his preliminary hearing, however, McDonald recanted his confession, stating that he had been duped by a friend of the defendant. He also offered an alibi which was accepted by the magistrate, and McDonald was released from custody.

At the defendant's trial, the court impeded his presentation of evidence tending to inculpate McDonald for the crime. First, when the State indicated that it did not intend to call McDonald as a witness, the court did not allow the defendant to treat him as an adverse witness. Accordingly, although he was permitted to read to the jury McDonald's signed out-of-court confession, he was not allowed to use leading questions in order to overcome the damage done to his case during the State's cross-examination of McDonald, at which time McDonald told the jury that the confession had been repudiated and was given only under a ruse; nor could the defendant explore McDonald's alibi, which also had been made known to the jury during cross-examination.

Moreover, because of the Mississippi "voucher rule," the defendant could not lay the foundation for the impeachment of McDonald's repudiation testimony with the three inculpatory declarations he made. Finally, not only did the court prevent the introduction of those statements for impeachment purposes, but it also barred their substantive use as well, citing the Mississippi rule against hearsay. Unsurprisingly, considering how hampered the defendant's defense was, the jury believed McDonald and convicted the defendant for Liberty's murder.

The United States Supreme Court reversed his conviction. In so doing, it first recognized that one of the most elemental concerns of due process in a criminal trial is the right of the defendant to defend himself.[2] It noted that like the State, the defendant must, in most instances, "comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." (*Chambers*, 410 U.S. at 302, 35 L. Ed. 2d at 313, 93 S. Ct. at 1049.) The Court acknowledged that one of those was the hoary rule which excluded most hearsay evidence; nevertheless, it held that when the hearsay rule directly conflicts with the constitutionally ensured right to defend oneself, the State's hearsay rule must bow to that more fundamental right.

Defendant apparently considers the key aspect of *Chambers* to be the reliability of the defendant's proffered hearsay. According to him, that decision obligates the trial court to admit such evidence when it is offered by the defendant so long as it can be found to be reliable. This, however, is an incorrect reading of the decision. Although the Court did state that the traditional purpose which undergirds the rule against hearsay was accommodated where the declaration carries with it adequate assurances of reliability, the mere existence of those assurances in the hearsay which was excluded in *Chambers* did not prompt the Court to reverse the defendant's conviction. Rather, it was that the evidence was *critical* to the defendant's presentation of a persuasive defense. *Chambers*, 410 U.S. at 302, 35 L. Ed. 2d at 313, 93 S. Ct. at 1049 ("We conclude that the exclusion of this critical evidence *** denied him a trial in accord with traditional and fundamental standards of due process"); see also *Gacy v. Welborn*

---

[2]*Chambers'* holding was grounded on a pure violation of the due process clause of the fourteenth amendment as opposed to a violation of the sixth amendment made applicable to the States through that clause, which is the guarantee that defendant invokes here. One commentator has theorized that the Court's choice was due to reservations it had concerning the defendant's procedural default of the claims in the State proceedings. (See 3 W. LaFave & J. Israel, Criminal Procedure § 23.3(f), at 20 n.58 (1984).) Despite these reservations, it is widely agreed that *Chambers'* holding has come to define the contours of the sixth amendment right to present a defense as well. See, *e.g.*, *Sharlow v. Israel* (7th Cir. 1985), 767 F.2d 373, 377 ("Although *Chambers* was decided on due process grounds, under the facts of this case the *Chambers* analysis is equally applicable to the petitioner's claim that he was deprived of his Sixth Amendment right to present a defense[ ]"); see also *People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313 (including an analysis of *Chambers* while discussing the commands of the "presentation of a defense" clause of the sixth amendment).

(7th Cir. 1993), 994 F.2d 305, 316 ("[*Chambers*] hold[s] that the states must permit defendants to introduce reliable third-party confessions when direct evidence is unavailable").

The extreme reliability of the declarations offered in *Chambers* meant only that the State had no valid interest in their exclusion. (See *Sharlow v. Israel* (7th Cir. 1985), 767 F.2d 373, 377 ("In *Chambers*, the Supreme Court, in addressing the importance of admitting evidence excluded under the hearsay rule, adopted a balancing approach in weighing the State's legitimate interest in formulating rules of evidence to conduct its trials against the defendant's need for the evidence and the evidence's trustworthiness").) In *Chambers*, since McDonald exculpated himself on the witness stand, the only way in which the defendant could expose his guilt to the jury was by way of his earlier extrajudicial inculpatory declarations made to the three witnesses. Consequently, the hearsay declarations were pivotal to his case, and, since they had sufficient guarantees of trustworthiness, being statements against interest, the balance tipped strongly in the direction of admitting the evidence.

Here, since he was the declarant of the statement he sought to introduce, defendant cannot show its criticalness. He was, after all, always free to take the stand and testify to all of the evidence contained in his statement. He cannot claim under *Chambers* that he is entitled to introduce his self-serving, uncross-examined earlier statement simply because he opted not to testify. As Judge Easterbrook bluntly observed only last year:

> "No court has extended [*Chambers* and *Green v. Georgia* (1979), 442 U.S. 95, 60 L. Ed. 2d 738, 99 S. Ct. 2150] to require a state to admit defendant's *own* out of court words. A defendant is available to himself as a witness. Nothing in the Constitution gives an accused the privilege of proffering, through hearsay, his self-serving statements while denying the state access to the rest of the story that could be got at by cross-examination." (*Gacy*, 994 F.2d at 316.)

Given defendant's incontestable ability to testify on his own behalf, the hearsay contained in his statement was neither critical nor even necessary to his defense; therefore, the court properly excluded such evidence under Illinois' rule against hearsay. See *People v. Berry* (1988), 172 Ill. App. 3d 256, 526 N.E.2d 502 (affirming the trial court's exclusion on hearsay grounds of the defendant's post-arrest statement to police in which he admitted to shooting the victim but stated that he did so in self-defense).

## II

■ In defendant's next assignment of error, he challenges the

trial court's use of the Class X range of sentence for his Class 1 offense. He admits that with his three prior Class 2 or greater felonies committed after 1977, he was qualified under section 5—5—3(c)(8) of the Unified Code of Corrections (Ill. Rev. Stat. 1991, ch. 38, par. 1005—5—3(c)(8) (now 730 ILCS 5/5—5—3(c)(8) (West 1992))) for an upgrade of his offense to Class X range for the purpose of punishment, but he contends that application of the enhancement provision should not have been used in his case given the nature of the crime.

The basis of his contention is his unsupported belief that the legislature intended the Class X sentencing provision to deter future crime. Relying on what he terms the manifest logic of the statute, he argues that since his was a crime which he did not *choose* to commit, but one which was done only in reaction to the perceived threat posed by his victim, it disserves the intended goal of the enactment to punish his crime under it. He maintains that in order to give effect to the true purpose of the act, we should carve an exception to the section, excluding from it those crimes, such as second-degree murder, against which no deterrent can be effective.

The legislation at issue provides:

> "When a defendant, over the age of 21 years, is convicted of a Class 1 or Class 2 felony, after having twice been convicted of any Class 2 or greater Class felonies in Illinois, and such charges are separately brought and tried and arise out of different series of acts, such defendant shall be sentenced as a Class X offender. This paragraph shall not apply unless (1) the first felony was committed after the effective date of this amendatory Act of 1977; and (2) the second felony was committed after conviction on the first; and (3) the third felony was committed after conviction on the second." (Ill. Rev. Stat. 1991, ch. 38, par. 1005—5—3(c)(8) (now 730 ILCS 5/5—5—3(c)(8) (West 1992)).)

The rules of statutory construction are, of course, well settled. The role of the courts when called upon to construe statutes is to ascertain the intent of the legislature by the enactments and, once divined, to give them their fullest effect. (*Henry v. St. John's Hospital* (1990), 138 Ill. 2d 533, 541, 563 N.E.2d 410, 414; *People v. Robinson* (1982), 89 Ill. 2d 469, 475, 433 N.E.2d 674, 677.) However, before relying on extrinsic aids such as the history of the act or, as defendant does, the "inherent" logic of the statute, the supreme court has held that a court must look to the words used by the drafters of the legislation, as they are most often the best indication of their intent. (*County of Du Page v. Graham, Anderson, Probst & White, Inc.* (1985), 109 Ill. 2d 143, 151, 485 N.E.2d 1076; *Robinson*, 89 Ill. 2d at 475, 433 N.E.2d at

677.) When interpreting the language of the act, the court is to give it its plain and ordinary meaning. *Maloney v. Bower* (1986), 113 Ill. 2d 473, 479, 498 N.E.2d 1102, 1104.

The key to determining whether section 5—5—3(c)(8) allows for any exceptions is its use of "shall" to define when a Class 1 or Class 2 offender is to be treated for sentencing purposes as though she committed a Class X crime. It has been held that while it does not create a conclusive presumption, the legislature, by using "shall" in a statute, is seen as signalling its intent to create a mandatory obligation. (*People v. Felella* (1989), 131 Ill. 2d 525, 546 N.E.2d 492; *People v. Emrich* (1986), 113 Ill. 2d 343, 498 N.E.2d 1140; see also *People v. Nicholls* (1977), 45 Ill. App. 3d 312, 316, 359 N.E.2d 1095, 1099 (noting that while construing statutes, "courts have generally held that the word 'shall' is mandatory, particularly when the word is addressed to a public official").) The question in this case then is whether the legislature intended "shall" to have a mandatory meaning, thus precluding any exceptions to the enhancement of a Class 1 or 2 offender's punishment due to his recidivism.

Although never squarely addressing the issue presented in this appeal, the supreme court has touched upon the proper connotation to be given to "shall" in the statute at issue. In *Morrow v. Dixon* (1985), 108 Ill. 2d 223, 483 N.E.2d 876, a circuit court judge was informed during the course of a bench trial that the defendant qualified for Class X enhancement of the Class 2 offense for which he was convicted. Nevertheless, the trial court judge sentenced him to three years' imprisonment, a term below the six-year minimum prescribed by the Unified Code of Corrections for a Class X offense. Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—1(a)(3) (now 730 ILCS 5/5—8—1(a)(3) (West 1992)).

In an original action seeking *mandamus* or, alternatively, a supervisory order, the supreme court held that so long as the sentencing judge is aware that the defendant's criminal past fits within that outlined in the section, it does not matter how she came to learn that the defendant qualified. After reaching this conclusion, the court ordered the trial court via *mandamus* to impose a sentence within the Class X range for the reason that, under section 5—5—3(c)(8), it was clearly mandated.[3] Thus, that case may be seen as standing for the proposition that "shall" in the section may not be

[3]Because the merits of the defendant's conviction was pending on direct appeal in the appellate court when this original action in the supreme court was decided, the court actually predicated the issuance of the writ on the affirmance of the trial court's finding of guilt.

considered merely directory. See also Aspen, *New Class X Sentencing Law: An Analysis,* 66 Ill. B.J. 344, 348 (1978) (concluding that the section is mandatory where an offender qualifies, and observing that "[the] enhanced penalty is in the nature of a *mandatory* 'extended' sentence, since the trial judge has no discretion to avoid sentencing the Class 1 or 2 offender to a Class X sentence where the offender *so* qualifies under this provision"). (Emphasis in original.)

Consistent with the *Morrow* court's mandatory interpretation of "shall," we hold that the legislature did not intend to allow any exceptions to the section; therefore, the circuit court was compelled by the act to find that defendant, who committed a Class 1 offense and had been convicted of the predicate earlier felonies, was to be sentenced pursuant to the Class X provision.

## III & IV

■ Defendant raises two other issues in his appeal. As to the first of these, we affirm the constitutionality of section 9—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1991, ch. 38, par. 9—2 (now 720 ILCS 5/9—2 (West 1992))) for the simple reason that every district and division of this court has so held; but, we reverse defendant's sentence of 15 years' imprisonment because the circuit court used his previous convictions twice to enhance his sentence: (1) when it used them as the predicates upon which it elevated him to Class X status for punishment purposes; and (2) when it relied on his recidivism to increase the term of his imprisonment, thus violating the rule announced in *People v. Owens* (1990), 205 Ill. App. 3d 43, 563 N.E.2d 75, and *People v. Ward* (1993), 243 Ill. App. 3d 850, 611 N.E.2d 590.

Moreover, since these were the only factors in aggravation which the court cited, it cannot be said that defendant would have received the same term even without the court's error. Consequently, under the authority of *Ward* and *Owens,* defendant's sentence must be set aside and the case remanded for a new hearing at which his punishment will be determined without reuse of the two felony convictions. Accordingly, the judgment of the circuit court is affirmed in part, reversed in part, and the action is remanded for further proceedings as directed by this appeal.

Affirmed in part; reversed in part and remanded with instructions.

HARTMAN and McCORMICK, JJ., concur.