THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES BARNWELL, Defendant-Appellant.

First District (3rd Division)    No. 1—94—3085

Opinion filed December 23, 1996.

James Barnwell, of Menard, appellant *pro se.*

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Barbara L. Jones, and Judy L. DeAngelis, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GORDON delivered the opinion of the court:

The defendant, James Barnwell, was indicted by grand jury for the abduction, robbery and rape of M.K. Included in the indictment were 18 counts of aggravated criminal sexual assault, three counts of criminal sexual assault, six counts of aggravated kidnapping, two counts of kidnapping, and one count each of robbery, aggravated possession of a stolen motor vehicle, burglary and aggravated criminal sexual abuse. Following a jury trial, defendant was found guilty of

aggravated criminal sexual assault, kidnapping and robbery, and was sentenced under the Habitual Criminal Act (720 ILCS 5/33B—1 (West 1994)) to natural life in prison with no possibility of parole. Defendant filed various post-trial motions for a new trial,[1] which the trial court denied, and defendant now appeals his conviction pursuant to Illinois Supreme Court Rule 603 (134 Ill. 2d R. 603).

At trial, the State presented the testimony of M.K., the complaining witness; Karen Grover, M.K.'s friend; Barbara Gebbia, the emergency room nurse who treated M.K. after the incident; and Chicago police officers Anthony Gvozdenovic and Kent Baker, the arresting officers. By way of stipulation, the State also presented the testimony of Christine Braun and Robert Berk, technicians in the Chicago police department crime lab.

On direct examination, M.K., 29 years old, testified that on the date she was attacked, Friday, January 17, 1992, she returned home from her job as an operations analyst for CNA. Once home, she received a telephone call from her friend, Karen Grover, who was upset because she had lost out on a job opportunity. M.K. agreed to accompany Grover to the Pump Room at the Ambassador East Hotel for a drink. Grover picked M.K. up at home in her 1989 yellow Honda Prelude, drove to the Ambassador East, and parked on a street one block northeast of the hotel. At approximately 11 p.m., Grover began feeling sick because she was very upset, was drinking, and had not eaten anything. She and M.K. therefore agreed to leave the bar, and Grover gave M.K. her keys so that M.K. could drive her home. Grover required the assistance of one of the bartenders to reach the exit door. Once outside, Grover leaned against a flower pot near the hotel for support, and M.K. told her to wait there while she retrieved Grover's car and returned to pick her up.

M.K. further testified that she proceeded alone to Grover's car, unlocked the door, sat in the driver's seat, and closed the door. Because she had never driven Grover's car before, M.K. was compelled to open the door again in order to illuminate the overhead light and to find the ignition. Before she could close the door again, it was "swung wide open" by the defendant, who then "slammed" M.K.

---

[1]Defendant's trial counsel filed the first post-trial motion for new trial on defendant's behalf. Defendant then filed a *pro se* motion for new trial in which he alleged ineffective assistance of counsel. The court thereafter granted defense counsel's request to withdraw from the case and appointed the public defender to represent defendant for purposes of post-trial motions and sentencing. Subsequently, the public defender filed a supplemental new trial motion, and defendant filed two additional *pro se* supplemental new trial motions.

down face-first into the passenger seat of the car. Defendant said "get down, shut up or I will kill you. I have a gun." The defendant then sat down in the driver's seat and began to drive the car, while he continued to hold M.K. face-down in the passenger seat. M.K. did not attempt to escape because she "was terrified for her life and [she] wanted to get out of there alive." After approximately 15 minutes, defendant parked the car and told M.K. that he was not going to hurt her but that he needed money for drugs. Defendant still held her face-down in the passenger seat so that she was unable to see where they were. Defendant then took M.K.'s purse from her shoulder and she heard defendant open the wallet inside the purse and take money which he "crumbled and stuffed" into his pocket. Defendant then threw the purse into the back seat of the car, removed M.K.'s glasses, threw them into the back seat, and told her "I need you to do one more thing for me, I need you to make love to me."

At that point, defendant demanded that she take off her clothes. When she did not respond, he "started going up her coat and skirt with his hands and removed her pantyhose, underpants and shoes." M.K. then heard defendant's zipper and belt buckle being undone, and she "felt the force of his penis penetrating [her] anus." Defendant said "I need to get you excited," and then rolled M.K. over and forced his tongue into her vagina. After a few minutes, defendant got on top of M.K. and "forced his tongue into [her] mouth." This was the first time she was face to face with defendant. Defendant then covered M.K.'s eyes and "forced his penis into her vagina," after which he again forced his tongue into her vagina, then again into her mouth, and then again attempted to force his penis into her vagina.

M.K. further testified that she heard defendant say "police," after which he jumped off of her and drove the car "very fast and recklessly" until he crashed. He immediately tried to get out of the car but could not because the driver's side door would not fully open. M.K. then heard police officers saying "[C]ome out, you're under arrest," and she started screaming, "[H]elp me, help me, I've been raped." The officers arrested the defendant and helped M.K. out of the car and into their squad car. Once in the squad car, at M.K.'s request, the police officers went back to Grover's car and retrieved M.K.'s purse, glasses, pantyhose, underwear, and shoes where she had left them. M.K. also looked in her purse and confirmed that the defendant had taken $28 to $30 from her wallet. Before leaving the scene, M.K. identified the defendant as her attacker. She was then transported to Grant Hospital.

During extensive cross-examination, M.K. stated that prior to the night of the attack, she had been a passenger in her friend Karen

Grover's yellow Honda Prelude on a few occasions. The night before the attack, M.K. had dinner with Grover at Shaw's Crab House during which she and Grover discussed Grover's employment situation. M.K. also testified that in between the driver and passenger seats of Grover's car were an automatic gear shift and a cellular telephone mounted on the console separating the two seats, and that the defendant shoved her over those objects when he entered Grover's car. M.K. did not know whether defendant used a condom during her attack. She further stated that defendant had turned the engine off during the attack, and that he turned it back on when he shouted "police." M.K. denied ever saying "I can't get caught with you" to the defendant, and denied hitting the gas pedal when the police first arrived. M.K. further testified on cross-examination that when she arrived at Grant Hospital approximately 15 minutes after the attack, she told an emergency room nurse everything that had happened and that the nurse wrote the events down. On redirect examination, M.K. testified that she had never seen the defendant before the night of the attack.

Karen Grover was then called to testify by the State. On direct examination, she gave substantially the same testimony regarding the events earlier that evening leading up to M.K.'s departure from the hotel to retrieve Grover's car. Grover additionally testified that she waited outside of the hotel for a "fairly long time" for M.K. to get the car to drive her home. Eventually, Grover walked into a nearby building where the doorman assisted her in hailing a taxi cab which took her to her apartment. A 24-hour doorman at her building let her into her apartment because she had given her keys to M.K. Once home, Grover called M.K. at home and left a message on her answering machine. Shortly after she hung up the telephone, police officers arrived and advised her of what had happened to M.K. Grover accompanied the police to Grant Hospital to see M.K. She stated that, at the hospital, M.K. looked very distraught, like she was in shock, and was shaking and crying.

On cross-examination, Grover initially stated that, prior to the date of the attack, she had not talked to M.K. for several days, but later remembered that she had dinner with M.K. at Shaw's Crabhouse on the night before the attack and that she had used a "2-for-1" coupon to pay for that dinner. On re-cross-examination, Grover testified that she had informed the police on the evening of the attack that she had eaten dinner with M.K. at Shaw's the previous evening.

Barbara Gebbia, a registered nurse at Grant Hospital who had treated M.K. on the night of the attack and who had previously

treated 40 to 50 sexual assault victims during her 23 years as a nurse, testified as an expert witness regarding M.K.'s condition and treatment while in the Grant Hospital emergency room. On direct examination, Gebbia testified that she interviewed M.K. about the attack and found it unusual that M.K. was able to actually quote to her segments of what the offender had said. Gebbia further stated that M.K. was crying and shaking and that a full body examination revealed no outward signs of physical injury. Gebbia performed routine fingernail scrapings, pubic and head hair combings, and rectal smears and swabs. Gebbia also stated that she did not take swabs from M.K.'s mouth because M.K. never indicated that she had been forced to perform oral sex on the defendant in addition to the other forced sexual acts that she described to Gebbia. Gebbia further testified that, although she found no signs of rectal tears or abrasions, it was possible that rectal penetration had nevertheless taken place. Gebbia stated that Dr. Mario Rojkind then performed a full pelvic examination which to Gebbia's knowledge revealed a "reddening of the cervix" but no vaginal trauma.

Chicago police officer Anthony Gvozdenovic testified on direct examination that he and his partner, Officer Kent Baker, were on patrol in their squad car at about 11:50 p.m. on January 17, 1992, when they saw a vehicle parked in the alley at approximately 1659 North Sedgwick with its brake lights "going on and off." The officers pulled into the alley behind the vehicle in order to investigate and saw that it was a yellow Honda Prelude. When they got out of their squad car and walked up to the vehicle, they noticed that the engine was running. It then sped off with no headlights on. The officers activated their emergency lights on their squad car and pursued the vehicle, which drove away erratically at an approximate speed of 45 miles per hour. The Prelude proceeded to drive through a stop sign and the pursuit ended when it crashed into two parked cars in a cul-de-sac on north Lincoln Park West.

Officer Gvozdenovic further testified that the two officers drew their service revolvers and approached the car. The defendant struggled as the officers attempted to pull him out from the driver's side of the car, at which point M.K. yelled "[H]elp me, help me, he just raped me." M.K. was very frightened, hysterical and upset, and was wearing no shoes, socks or pantyhose. Two other police officers arrived at the scene and assisted in handcuffing the defendant. Officer Gvozdenovic moved M.K. into his squad car, and after she told him what had happened, he returned to the Honda where he found her glasses, open purse, underwear, pantyhose and shoes. Officer Baker then questioned M.K. as to whether defendant had done

anything else to her and, after that conversation, instructed his partner to search the defendant. In that search, $28 in crumpled and mashed bills was recovered from defendant's pocket and no money from his wallet. M.K. identified the defendant at the scene as "the man that raped and robbed" her.

On cross-examination, Officer Gvozdenovic testified that no weapons were recovered and that defendant was 6 feet 4 inches tall, weighed 220 pounds, and was a "pretty big guy." Officer Kent Baker was then called to the stand by the State and gave substantially the same testimony regarding the incident in question as Officer Gvozdenovic.

Before the State rested, the trial court granted the State's motion to admit several items into evidence, including four photographs of the yellow Honda Prelude, taken from different angles at the site where it ultimately crashed on the night of the attack; M.K.'s ripped pair of pantyhose that she was wearing at the time of her attack; a "Polaroid" snapshot of the defendant taken shortly after his arrest; and a diagram of the area that the defendant and M.K. covered during the course of the abduction, attack, and attempted escape.

The State also presented the stipulated testimony of Christine Braun, a serology expert in the Chicago police department crime lab, and of Robert Berk, a trace evidence expert with the same crime lab. The parties stipulated that, if Christine Braun were called to testify, she would state that she had examined the sexual assault kit taken from M.K. and had found that M.K.'s vaginal and rectal swabs and smears were negative for sperm, spermatozoa and semen. The parties further stipulated that if Robert Berk were called to testify, he would testify that the hair combings taken from M.K. were consistent with Caucasian hair (the defendant was black and had black hair). The prosecution then rested its case, and a motion by the defendant for directed verdict was denied.

During an instructions conference after the prosecution rested, the trial court questioned defendant as to whether he wished to testify. Defendant stated that he had conferred with his attorney and did not wish to testify and that he had made that decision freely.

Only one witness testified for the defense, David Arenberg, a friend of the defendant. On direct examination, Arenberg testified that he had met the defendant at a party at the house of defendant's brother three years earlier. Arenberg said that, on the night of the attack, he had plans to meet several people, including the defendant, at a bar on Rush Street on Chicago's near north side. At 11 p.m., he and the defendant met outside of that bar, and while they were talk-

ing to each other, Arenberg observed a bright yellow Honda Prelude pull up to the curb near the alley and honk its horn. Defendant walked over to the car, the driver opened the passenger-side window, and defendant stuck his head inside. Defendant then spoke with the driver for a few minutes, returned and spoke with Arenberg, and then got into the car, which then drove away.

On cross-examination, Arenberg stated that when the driver of the Prelude honked the horn, there were several other people standing outside of the bar near that car. Arenberg further testified that he had spoken with the defendant about the case after defendant was arrested and that he never contacted the police department to inform them of what he had seen on the night of the arrest. On redirect examination, Arenberg explained that he did not call the police because he was cooperating with defendant's family and attorney.

Following closing argument and the giving of the instructions to the jury, a guilty verdict was returned for aggravated criminal sexual assault, kidnapping and robbery.[2] During defendant's sentencing hearing, the State established defendant's prior convictions for rape in 1975 and for home invasion in 1981. The trial court therefore found that defendant met the definition of a habitual criminal under the Habitual Criminal Act (720 ILCS 5/33B—1 (West 1994)), and defendant received a mandatory sentence of life imprisonment with no possibility of parole.

## DISCUSSION

■ On appeal, we permitted the defendant to file a *pro se* brief in addition to the brief filed by the public defender on his behalf. In his *pro se* brief, defendant first contends that the trial court erred in granting the State's motion *in limine* to exclude the introduction of police reports containing exculpatory statements allegedly made by the defendant to police upon his arrest and incorporated by the police in their police report. In his statement to the police, the defendant said that he had met M.K. at a bar on Division Street in Chicago on the night before the alleged attack. After a conversation and some dancing, he and M.K. exchanged names and telephone numbers and agreed to meet on the following night at the same bar. Defendant also informed police that, on the following night, while outside that

---

[2]Defendant has challenged the failure of his attorney to object to the remarks of the prosecution in closing argument and his failure to proffer certain jury instructions. These remarks and omitted instructions will be set out more fully below in the context of our discussion of the legal issues raised.

bar, M.K. pulled up in a car, honked the horn, and defendant got into the car. Defendant told police that M.K. then informed him it was a friend's car and that she had to get home. Defendant also told the police that, after asking defendant to drive, M.K. directed him into an alley, where she performed oral sex upon him. The police report further reflects that the defendant further said that, during this act, the police pulled up behind them, at which point M.K. extended her foot to the gas pedal and "kept her foot on the gas until the car hit the parked cars."

Defendant's contention with respect to the admissibility of his exculpatory statements as reflected in the aforementioned police reports is wholly lacking in merit. We first note that defendant has waived this issue on appeal. Notwithstanding plain error, both a trial objection and a written post-trial motion are required for the review of alleged errors at trial. *People v. Enoch*, 122 Ill. 2d 176, 522 N.E.2d 1124 (1988); *People v. Schmidt*, 168 Ill. App. 3d 873, 522 N.E.2d 1317 (1988). Plain error is any substantial error occurring in cases where the evidence is closely balanced, or any error which causes the defendant to be deprived of a fair trial. *Schmidt*, 168 Ill. App. 3d 873, 522 N.E.2d 1317; *People v. Lamparter*, 56 Ill. App. 3d 823, 371 N.E.2d 997 (1977). Here, because defendant failed to either object to the State's motion *in limine* (in fact, trial counsel explicitly conceded the point) or to raise the issue by post-trial motion, the issue has been waived. Moreover, based upon the overwhelming evidence presented through the testimony of the complaining witness, Grover, the police, and Nurse Gebbia, no plain error can be raised, as the evidence was by no means closely balanced.

■ However, even if waiver would not be invoked, defendant's contention would nevertheless fail on its merits. A trial court's ruling on a motion *in limine* will not be disturbed absent an abuse of discretion. *People v. Dunum*, 182 Ill. App. 3d 92, 537 N.E.2d 898 (1989). It is well established that a criminal defendant's exculpatory statements made while in police custody constitute inadmissible hearsay, as would be the case with any out-of-court, self-serving declaration by a party not subject to any exception recognized by the hearsay rules. *Dunum*, 182 Ill. App. 3d 92, 537 N.E.2d 898; *People v. Visnack*, 135 Ill. App. 3d 113, 481 N.E.2d 744 (1985). Thus, the trial court was well within the latitude of its discretion to exclude these exculpatory statements.

■ Defendant, however, contends in his *pro se* brief that, by granting that motion, the trial court violated his constitutional rights as articulated in *Chambers v. Mississippi*, 410 U.S. 284, 35 L. Ed. 297, 93 S. Ct. 1038 (1973), to permit the introduction of hearsay where criti-

cal to his defense. This constitutional contention is wholly without merit.

Under *Chambers*, a state's hearsay rule may under proper circumstances be required to yield to the right of a defendant to defend himself when the hearsay is critical to the presentation of his defense. See *Chambers v. Mississippi*, 410 U.S. 284, 35 L. Ed. 297, 93 S. Ct. 1038 (1973); *People v. Thomas*, 171 Ill. 2d 207, 664 N.E.2d 76 (1996). However, a hearsay statement is neither critical nor even necessary to a defendant's defense where the defendant is the declarant of the statement and is available to testify in his own behalf. Under such circumstances, the statement is properly excluded under the prevalent hearsay rules. See *People v. Thomas*, 266 Ill. App. 3d 870, 640 N.E.2d 1267 (1994). Moreover, under *Chambers*, in addition to being critical, the hearsay must also be reliable. *Chambers*, 410 U.S. 284, 35 L. Ed. 297, 93 S. Ct. 1038; *Thomas*, 266 Ill. App. 3d 870, 640 N.E.2d 1267. Here, where the defendant himself is the declarant, it is difficult to conceive how his unverified, uncross-examined, self-serving statements to the police could meet the test of reliability that *Chambers* clearly requires. See *Gacy v. Welborn*, 994 F.2d 305, 316 (7th Cir. 1993) ("No court has extended [*Chambers v. Mississippi*] *** to require a state to admit defendant's own out of court words. *** Nothing in the Constitution gives an accused the privilege of proffering, through hearsay, his self-serving statements while denying the state access to the rest of the story [through] cross examination," (emphasis omitted)). Therefore, defendant cannot hope to use his statements to the police in place of becoming an in-court witness on his own behalf.

Defendant's reliance in his *pro se* brief upon the decision in *People v. Cook*, 33 Ill. 2d 363, 211 N.E.2d 374 (1965), is misplaced. In *Cook*, the defendant sought to introduce into evidence circumstances surrounding his confession, which the State had previously placed into evidence. *Cook*, therefore, is wholly inapplicable to this case, where the defendant seeks to place into evidence his own self-serving out-of-court declarations, not to temporize any confession, but as substantive, independent evidence.

■ Defendant next contends that the trial court erred in denying his request for an instruction relating to the defense of consent. He contends that such denial violated his due process rights and prevented the jury from finding him not guilty. We disagree. A defendant has a right to the benefit of any defense shown by the entire evidence, and "very slight" evidence of a given theory of a case will warrant the giving of an instruction. *People v. Bratcher*, 63 Ill. 2d 534, 540, 349 N.E.2d 31, 34 (1976); *People v. Brown*, 214 Ill. App. 3d

836, 574 N.E.2d 190 (1991). Here, as noted by the trial court, there was not even very slight evidence to warrant the giving of a consent instruction.

The case of *People v. Brown* is in point. In that case, the defendant persuaded young women to accompany him into a hotel room where he performed various sexual acts upon them. The *Brown* court held that the trial court properly refused a jury instruction on the issue of consent, stating that merely because a rape victim consents to go into a hotel room does not mean that a jury could infer that she consented to the sexual acts that occurred therein. See also *People v. Wheeler*, 200 Ill. App. 3d 301, 558 N.E.2d 758 (1990) (neither 10-year sexual relationship between defendant and victim nor their consensual sexual relations after the subject rape gave rise to the "very slight" evidence necessary to require an instruction on consent). In the instant case, as in *Brown*, based upon the testimony of David Arenberg that the complaining witness rolled down the window and talked to defendant before he entered the car, there may be some slight basis for dispute as to whether M.K. permitted the defendant to enter her friend's car. However, there can be no dispute that the aforementioned sexual acts were not consented to. As to that, the evidence presented is uncontradicted that the defendant subjected M.K. to those sexual acts after threatening to kill her if she failed to cooperate. Thus, as in *Brown*, the trial court properly refused the consent instruction.

Moreover, despite defendant's contention to the contrary, the fact that no gun was found when the defendant was apprehended following the rape does not constitute the slight evidence necessary to require a consent instruction. In that regard, we first note that M.K. never testified that defendant had a gun or that she saw him with one, but, rather, she merely stated that he said he had a gun. Her testimony was that immediately after forcing his way into the car and slamming her head into the passenger seat, defendant said "get down, shut up or I will kill you. I have a gun." Thus, the actual presence of a gun is collateral to the fact that he claimed to have a gun when he threatened her and that he therefore caused her to believe that he had such a gun. Accordingly, the failure to actually find a gun under these circumstances is not sufficient to create any inference of consent to the sexual acts that occurred on the night in question. See *Brown*, 214 Ill. App. 3d 836, 574 N.E.2d 190; *Wheeler*, 200 Ill. App. 3d 301, 558 N.E.2d 758. See also *Bratcher*, 63 Ill. 2d 534, 349 N.E.2d 31 (self-defense instruction properly refused where evidence showed that defendant initiated fight in question).

Defendant cites to six cases upon which he purportedly relies in

support of his consent instruction argument: *People v. Roberts*, 75 Ill. 2d 1, 387 N.E.2d 331 (1979); *People v. Fryman*, 4 Ill. 2d 224, 122 N.E.2d 573 (1954); *People v. Burgin*, 74 Ill. App. 3d 58, 392 N.E.2d 251 (1979); *People v. Hayn*, 34 Ill. App. 3d 1029, 341 N.E.2d 182 (1976); *People v. Browry*, 8 Ill. App. 3d 599, 290 N.E.2d 650 (1972); and *People v. Hanserd*, 125 Ill. App. 2d 465, 261 N.E.2d 317 (1970). Of these six cases, only one, *People v. Fryman*, has any relevance to the issue for which defendant cites them. The other cases, on their face, do not purport to deal with the issues involved here. In *Fryman*, our supreme court held that the trial court erred in failing to give a consent instruction under the facts of that case. However, the facts there are far different from those here. In *Fryman*, there was testimony presented that the complaining witness agreed to a second date with one of her alleged attackers under noncoercive circumstances, and one of the defendants testified that the complaining witness willingly participated in the sexual acts at issue there. In contrast, here, defendant did not testify at all much less on the issue of consent, and as already noted, no evidence was otherwise presented to indicate that the sexual acts performed upon M.K. were consensual in the first instance.[3]

For the foregoing reasons, judgment of the circuit court of Cook County is affirmed. As part of this order, we grant the State's motion and assess defendant $150 as costs for this appeal.

Affirmed.

McNULTY and HOURIHANE, JJ., concur.

---

[3]In order to comply with the appellate court page limitations specified by Supreme Court Rule 23 (166 Ill. 2d R. 23), we have eliminated from the text of this opinion our discussion of defendant's remaining contention that he was denied effective assistance of counsel. We found this contention to be without merit. For a full discussion of this issue, see the entire unabridged "hybrid" opinion of *People v. Barnwell*, No. 1—94—3085, filed with the clerk of this court.