2021 IL App (1st) 173182-U

THIRD DIVISION
September 8, 2021

No. 1-17-3182

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 15542 |
| | ) | |
| MICHAEL D. LYMON JR., | ) | Honorable |
| | ) | Carl B. Boyd, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE ELLIS delivered the judgment of the court.
Justices McBride and Howse concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Affirmed. Trial court did not violate defendant's right to present defense by admonishing witness about his right against self-incrimination. Counsel's failure to elicit evidence of search at suppression hearing had no basis in valid strategy but did not prejudice defendant. Trial court did not improperly rely on elements of offense as aggravating factors at sentencing.

¶ 2    Defendant Michael Lymon was convicted after a bench trial of being an armed habitual criminal (AHC). On appeal, he argues (1) that the trial court erroneously barred his witness from testifying on the ground that he was in danger of incriminating himself; (2) that his attorney was ineffective at a suppression hearing for failing to elicit any evidence of the search that yielded the gun he was charged with possessing; and (3) that the trial court improperly relied on the elements of the AHC conviction as aggravating factors at sentencing. We affirm.

¶ 3                                    BACKGROUND

¶ 4      On the evening of October 1, 2016, defendant was stopped by Officer Malik Matariyeh, of the Hazel Crest Police Department, for making an illegal turn on a red light. Isaiah Driver was in the back seat of defendant's car; Tiwan Raybon was in the front passenger seat. During the stop, Officer Matariyeh searched the car and seized a .22 caliber Jiminez pistol from a bag in the back seat. That gun was the basis for the AHC charge. The defense filed a motion to suppress.

¶ 5                              I. Suppression hearing

¶ 6      At the suppression hearing, counsel called defendant, Officer Matariyeh, and Driver. Counsel began with a brief direct examination of defendant that consumed less than a page of the court reporter's transcript, eliciting the following and only the following: that defendant's car was stopped by police at 8:52 pm on October 1, 2016 for a "no turn on red;" the car belonged to defendant; and defendant had valid registration, a driver's license and automobile insurance.

¶ 7      On cross-examination, defendant testified that Officer Matariyeh approached the car and asked for everyone's license. When he later returned from the squad car, he said that he smelled cannabis. Defendant denied that anyone had smoked cannabis in the car or before getting into it. He also testified that everyone sat still from the time they were pulled over until the officer later returned with their licenses. Defendant, in particular, kept his hands on the steering wheel.

¶ 8      According to defendant, Officer Matariyeh said something to this effect: "I smell weed, I need to search the car." When the prosecutor asked what happened next, defendant testified, "I mean I allowed him to search the car." The prosecutor followed up with, "You gave him consent to search the vehicle?" Defendant answered, "Yeah." He later repeated that answer.

¶ 9      On redirect, counsel asked defendant to clarify his testimony: Did the officer actually ask for consent to search the car, or did he simply order defendant to get out? Defendant made clear

that he meant the latter. At various points, he testified: "[H]e basically said (indicating) I smell marijuana, I need to search the car;" and "He basically told me, so it's not like I had to say a yeah;" and "I mean he basically just said (indicating) I small marijuana. I need to search the car. He didn't really like ask. And I mean I corroborated (sic), so I mean I guess that's a yes answer." Lastly, when asked by counsel, "Why did you leave the vehicle?" defendant answered, "Because the officer said I need to search the vehicle. That was his own—the word need, I need to search the vehicle."

¶ 10    Defendant, Driver, and Raybon got out of the car. After backup arrived, Officer Matariyeh searched all three passengers and then searched the car. The prosecutor asked whether the police recovered anything during the search. Defendant answered, "no cannabis." The prosecutor asked again, and defendant said, "contraband."

¶ 11    Counsel objected to this line of questioning as beyond the scope of direct examination. As counsel later explained, "[t]he Defendant's testimony that I was seeking to elicit was solely for the purpose of establishing ownership interest in that vehicle at that time and that place that evening." That is because, in counsel's view, "we are not here on what was found in the car, just the basis for the search." The defense, counsel explained, was moving to suppress the fruits of the search, but the identify of any such items, whatever they may have been, "was not in contention here," and counsel did not want to get that question "interposed and mixed up in what happened in the events leading up to the discovery." Counsel therefore asked the court "to cut off the line of questioning after they were removed from the vehicle and the police officers were going to begin their search."

¶ 12    The prosecutor responded that because defendant was charged with AHC, the police must have recovered a gun from his (alleged) possession. To decide whether that gun was the fruit of

an illegal search, and thus to rule on defendant's motion, the court needed to know where and when the police seized it.

¶ 13     As the court understood defense counsel's point, "there has been no search according to the testimony. So there is nothing to suppress at this time, all right." The court never formally ruled on counsel's objection, but it assured the prosecutor that the State could recall defendant for the purpose of establishing the particulars of any search alleged in the motion.

¶ 14     Defense counsel then called Officer Matariyeh. He testified that, as he approached defendant's car the first time, he saw some of the occupants making "sudden movements." Given his limited vantage point and the car's tinted windows, he could not tell what, specifically, they were doing. But it appeared to him, generally speaking, that "the two front passengers [namely, defendant and Raybon] were doing a lot of hand movements," and he agreed with the prosecutor's characterization of those movements as "furtive." Based on his "training and experience," he believed that "some type of contraband was being stashed away somewhere, it was being hidden."

¶ 15     Concerned for his safety, Officer Matariyeh instructed the occupants to roll down all the windows and remain still. As he collected everyone's identification, he smelled a strong odor of burnt cannabis. At some point, he asked defendant whether anyone had smoked cannabis in his car. Defendant said no, and he explained to the officer that they had been filming a music video where other people were smoking, so that the smell was probably lingering on their clothes.

¶ 16     Officer Matariyeh returned to his squad car to run defendant's license and request backup. From there, he saw people continuing to make "sudden movements" in the car, despite having been told to remain still. When another officer arrived, Officer Matariyeh "explained to her that [he] was going to search the vehicle."

¶ 17    To this end, he "asked for [defendant] to step out of the vehicle" and searched him. He then did the same with the other passengers. He did not find cannabis or any other contraband on anyone. Nor did he see anyone discard anything from the car either before or during the stop. He was never questioned about his search of the car.

¶ 18    Driver testified, in sum, that they had been filming a documentary earlier in the day. He did not see any of the car's occupants smoking cannabis at any point, and he did not smell any unusual odors in the car. After the police pulled them over, the officer ordered everyone out of the car, and they all complied. Nobody was moving around in the car at any time during the traffic stop, and hence the officer never ordered—never had to order—them to stay still.

¶ 19    After Driver testified, the State moved for a directed finding. As the prosecutor argued, there was no testimony that any contraband was recovered from defendant's possession, much less any evidence of where it was recovered from, or whether defendant had a reasonable expectation of privacy in that specific location. Counsel responded that the court could "take judicial notice based on the charges against the Defendant that there was something recovered there that we are seeking to have quashed," and that this piece of contraband, whatever it was, "was not cannabis."

¶ 20    The trial court granted the State's motion for a directed finding. The court found that defendant failed to establish through testimony that his car was searched, much less what was recovered in that search or where it was recovered. The court further found that defendant consented to a search of his car.

¶ 21                                    II. Bench trial

¶ 22    The State's sole witness at trial was Officer Matariyeh. His trial testimony was consistent with his testimony from the suppression hearing. But unlike the suppression hearing, at trial, he

also testified to his search of defendant's car. During that search, he recovered a black gym bag on the back seat, directly behind the driver's seat. Inside the gym bag was a smaller "cologne type of bag," housing a .22 caliber Jimenez semi-automatic pistol with two live rounds in the magazine and one in the chamber. Forensic analysis did not reveal any prints on the gun. Defendant did not admit that the gun was his.

¶ 23    Inside the gym bag, along with the gun, were some personal hygiene items, defendant's W-2 form, a pair of Bulls tickets paper-clipped to a slip marked "M. Lymon," and six other pieces of mail, all addressed to defendant, from various senders, including defendant's employer, his credit card provider, and the City of Chicago Department of Finance.

¶ 24    Officer Matariyeh was unable to verify defendant's FOID status on the scene, but when the prosecutor asked if he checked whether Driver and Raybon had valid FOID cards at the time, he answered, "Yes. I believe they didn't."

¶ 25    The State introduced a certified title for the car defendant was driving, showing it was owned by defendant and his wife, and certified records of defendant's two qualifying felonies, a 2005 robbery and a 2013 unlawful use or possession of a weapon by a felon (UUWF).

¶ 26    Driver was the only witness called by the defense. Driver testified that on the night of the stop, he was out filming a documentary on music and violence prevention with defendant and one other person. Driver recounted getting stopped by the police and stepping out of the car at the officer's request. Driver had been sitting in the back seat, where, he said, "there were a lot of things," and in particular, "a lot of bags." The officer searched the car, emerged with a black bag, and asked who that bag belonged to. Driver asked which bag the officer was referring to, since "there were several back there," but the State's objection was sustained on hearsay grounds. At the time of the stop, Driver owned a .22 caliber Jimenez pistol and had a valid FOID card. That

day, he was carrying a black gym bag. He had his gun with him throughout the day, but, as he testified, "I didn't have it on my person, I had it in a bag."

¶ 27    At that point, the trial court granted the State's request for a sidebar. The State had not verified whether Driver had a valid FOID card at the time, but, as the prosecutor explained, "I don't believe he has [*sic*] a conceal/carry license at the time." Thus, if he admitted that the gun was his, he would be admitting to a crime, since the gun was loaded and immediately accessible to Driver. For that reason, he needed to be "admonished and appointed counsel" before testifying any further. And because the State would be unable to cross-examine Driver, due to the potential for him to incriminate himself, his testimony thus far should be stricken.

¶ 28    Defense counsel responded that, at most, Driver might be in danger of admitting to a "misdemeanor UUW," since he had a valid FOID card, and the gun was neither on his person nor readily accessible.

¶ 29    The trial court agreed that Driver was in danger of incriminating himself, and whether it would be a misdemeanor or felony was beside the point. The judge accordingly admonished Driver about his fifth-amendment privilege against self-incrimination and explained to him that "certain responses to the questions that are posed to you * * * may expose you to liability that could be a felony in nature," or "could have some criminal potential." On this basis, the judge struck Driver's testimony thus far. "And before you testify again," the judge continued, "I would advise you to seek the council [*sic*] of your own independent lawyer, before you testify about this case in the manner in which you were proceeding." Driver acknowledged that he understood.

¶ 30    After a brief pause in the proceedings, the defense rested. Counsel explained that he had a chance to discuss the matter with defendant, and the defense decided that it was not going to recall Driver.

¶ 31    In closing, the defense argued that the State failed to prove defendant's constructive possession of the gun. The only evidence of constructive possession was Officer Matariyah's "claim that this massive amount of mail is found within the bag." And that "claim," counsel argued, was not credible. After all, it was defendant's car, so he "had the opportunity to have mail throughout the car." He "probably had his own documents within the glove box," but the officer said there was nothing in there. And it is "difficult to believe," as the officer testified, that "nothing of value [was] found within the entire vehicle" when it was inventoried after being towed from the site of the traffic stop.

¶ 32    The trial court found defendant guilty of AHC. In so doing, the court rejected counsel's attack on Officer Matariyah's credibility. The court had "no doubt" that the gym bag belonged to defendant, given how much of his mail was found inside of it, as the officer had testified.

¶ 33                                III. Sentencing

¶ 34    Arguing in aggravation, the State noted that defendant was on "parole," or mandatory supervised release, when he committed this offense. His prior offense was a UUWF from 2013, for which he received the mandatory minimum prison sentence of 3 years. Before that, defendant had been convicted of robbery in a 2005 case and was sentenced to two years' probation. He had no other prior convictions.

¶ 35    The State argued that because defendant "already got the minimum two times," and was not deterred either time from further criminal activity, a minimum sentence was not appropriate in this case.

¶ 36    In mitigation, defendant pointed to his history of gainful employment, stable marriage and family life, and his continuing financial support of his ailing mother and grandmother. He also presented evidence of his work with the Rainbow PUSH Coalition—including seminars,

speaking engagements, and an educational film—all aimed at keeping young people out of the criminal justice system.

¶ 37    The trial court described this as a "delicate" case, as far as sentencing was concerned. On the one hand, there was substantial mitigation, favoring a lenient sentence. But on the other hand, as the State had argued, minimum sentences had proven insufficient to deter defendant. Taking all of this into account, and considering the Class X range of 6-30 years, the trial court imposed a slightly above-the-minimum sentence of 7 years in prison.

¶ 38                                ANALYSIS

¶ 39                        I. Right to present a defense

¶ 40    Testifying on defendant's behalf, Isaiah Driver claimed to own a .22 caliber Jimenez pistol that he was carrying around in a black gym bag on the day of the traffic stop—thus all but explicitly saying that the gun found in defendant's car was his. The trial court was concerned that in offering this testimony, Driver was potentially, and perhaps unwittingly, exposing himself to criminal liability. The court therefore admonished Driver about his fifth-amendment privilege against self-incrimination and struck his testimony thus far, so that Driver could confer with his own attorney before deciding whether to offer such testimony under oath. In so doing, defendant contends, the trial court "barred" Driver from testifying, and on legally erroneous grounds: As defendant sees matters, Driver could not have been in any potential jeopardy, since he had, or at least claimed to have, a FOID card. And because Driver's testimony was central to defendant's claim of innocence, barring that testimony violated his constitutional right to present a defense.

¶ 41    A trial court has discretion to admonish a witness about his fifth-amendment privilege if the court perceives a risk that the witness will incriminate himself, especially if the witness is testifying without the benefit of counsel. *People v. Radovick*, 275 Ill. App. 3d 809, 815 (1995);

*People v. Morley*, 255 Ill. App. 3d 589, 597 (1994). But such admonishments, while in general justified, will infringe on the defendant's right to present a defense if they meet two conditions: They may have caused the witness to decide not to testify, and they were "somehow improper." *People v. King*, 154 Ill. 2d 217, 224 (1993); *Radovick*, 275 Ill. App. 3d at 815; *Morley*, 255 Ill. App. 3d at 598; see also *People v. Voit*, 355 Ill. App. 3d 1015, 1025 (2004) (applying same test, derived from *King*, to admonishments given by prosecutor instead of court).

¶ 42     "Causation" in this context ordinarily means that the trial court's admonishments "could have caused [the witness] to assert his fifth-amendment right against self-incrimination." *King*, 154 Ill. 2d at 224. In *King*, for example, cited here by defendant, a witness called by the defense was admonished by the judge that his plea deal would be revoked if his testimony contradicted the judge's erroneous recollection of the facts he stipulated to in the plea. *Id.* at 220-22. After the witness was admonished, he took the fifth. *Id.* at 222. In his affidavit—*King* was a collateral proceeding—the witness stated that he would have testified on the defendant's behalf, but he was afraid that the judge would not have imposed the favorable sentence agreed upon in his plea deal if he did. *Id.* at 222-23.

¶ 43     And in *Morley*, 255 Ill. App. 3d at 594-95, 599, also cited here by defendant, a witness was not only willing but determined to testify on the defendant's behalf, even though his own attorney advised him not to do so on the ground of potential self-incrimination. The trial court also admonished the witness about that possibility; and then, while the witness was consulting with his attorney, the judge came into the room and warned the witness that he "had a shot" in his own case if he did not testify in this one, but if he did testify, "there would be two convictions, instead of one." *Id.* at 595. Small wonder that the witness changed his mind and declined to testify. *Id.*

¶ 44 This case is different than *King* and *Morley* in many key respects, but the one that matters for the causation inquiry is this: Here, Driver did not take the fifth, nor at any point did he say—at least on the record—that he changed his mind and was no longer willing to testify for the defense in this case. Thus, defendant cannot establish that the admonishments were a possible cause of his witness's decision not to testify. The record does not tell us whether any such "decision" was ever made.

¶ 45 But defendant makes another argument that falls under the general rubric of causation. The trial court, he says, flat-out "barred" Driver from testifying. As best we understand defendant's argument, this "bar" was imposed by the combination of the admonishments and the court's decision to strike Driver's testimony.

¶ 46 The record does not bear out this claim, either. The court did not completely "bar" Driver from testifying. This much is evident from the court's remarks to Driver immediately before and after admonishing him and striking his testimony. As the court began, "*before you continue with your testimony*, I have to just admonish you that what you say, depending on how you testify, sir, could be used against you." (Emphasis added.) Afterwards, the court continued, "*before you testify again*, I would advise you to seek the council [*sic*] of your own independent lawyer, *before you testify about this case* in the manner in which you were proceeding." (Emphases added.)

¶ 47 The court never said that Driver could not testify, full stop. Rather, the court admonished him to carefully assess the potential risks of self-incrimination, ideally with the assistance of his own attorney, "before" deciding whether to do so. And the court struck the testimony he had offered so far, thereby ensuring that he had not made any potentially incriminating statements under oath before consulting with his attorney. Nothing in the record establishes that the court

would have barred the defense from recalling Driver after a continuance to allow him to consult a lawyer. Indeed, the court's repeated use of phrases like "before you testify" and "before you continue with your testimony" indicate precisely the opposite.

¶ 48    As the record stands, the decision that ultimately kept Driver off the stand was not made by Driver himself or by the trial court. It was made by defense counsel. Immediately after Driver was excused, counsel conferred with defendant during a short break and announced to the court that "[w]e have come to the decision that we're not gonna be calling Mr. Driver or anybody else at this time; so I don't think there's any point in getting a date." The defense then rested.

¶ 49    The record does not disclose counsel's (or perhaps defendant's) reasons for this decision, but it is hard to imagine that the court's challenged actions—admonishing Driver, striking his testimony for the time being, and pausing the proceedings so he could confer with his attorney—were not at the root of it, especially since Driver's testimony was the whole of the defense case. But all the same, the decision came from counsel, and it was made in short order, without even waiting to see what Driver would decide to do. Because the record does not establish whether Driver would have been willing to testify again—for all we know, he might have been—and because the record gives us every reason to believe that the trial court would have permitted the defense to recall him, we cannot find that the trial court "caused" Driver not to testify. And so we cannot conclude that the court deprived defendant of his right to present a defense.

¶ 50    It is possible, of course, that counsel made a hasty or ill-considered judgment in the face of the trial court's reaction to Driver's testimony. But that is a different allegation, and one that defendant would have to pursue, if at all, in a collateral proceeding.

¶ 51    Having reached these conclusions, we need not consider defendant's further argument that Driver was in no danger of incriminating himself, and hence that it was improper for the trial

court to admonish him at all. Nor do we need to address the State's arguments that defendant forfeited this issue below.

¶ 52                                  II. Ineffective assistance at suppression hearing

¶ 53    While searching defendant's car, ostensibly for cannabis, Officer Matariyeh found a gun in a gym bag on the back seat. This basic fact, crucial though it was to the defense's motion to suppress, was not established until trial. At the suppression hearing, counsel did not ask the officer—or defendant, or Driver—a single question about the search of the car or the seizure of the gun. For all the trial court knew, having listened to the defense case at the hearing, there was no evidence to suppress, much less a proven basis on which to suppress it. The trial court thus granted the State's motion for a directed finding, and the gun was admitted into evidence at trial.

¶ 54    Defendant argues that counsel was ineffective in litigating the motion to suppress. We cannot imagine what valid strategic reason counsel could have had for failing to establish what areas the police searched, where the gun was found, or even *that* it was found. There seems to be no reasonable explanation for these failures, other than the one defendant now offers on appeal: Counsel did not grasp the defense's burden to make a *prima facie* case that the evidence to be suppressed was the fruit of an illegal search, a burden that requires the defense, among other things, to establish any necessary "factual * * * bases" for the motion. *People v. Brooks*, 2017 IL 121413, ¶ 22; see *People v. Berg*, 67 Ill. 2d 65, 68 (1977) ("Where the basis for the motion is an allegedly illegal search, it is incumbent upon the defendant in the first instance to establish both components: that there was a search, and that it was illegal.").

¶ 55    But we need not dwell on these failures (they are documented in enough detail above) or the issue of counsel's deficiency. To prevail on his ineffectiveness claim, defendant must also establish prejudice, and if he cannot, we can dispose of his claim on this basis alone. *People v.*

*Henderson*, 2013 IL 114040, ¶ 11.

¶ 56    Prejudice in this context, our supreme court clarified in *Henderson*, is a decidedly "stringent" standard. *Id.* ¶ 12. Defendant must establish (1) that his motion to suppress was meritorious, and (2) a reasonable probability of a not-guilty verdict had the evidence been suppressed. *Id.* ¶ 15. A suppression motion is "meritorious" if defendant can show that "it would have succeeded;" a reasonable probability of success is not enough. *Id.* ¶ 12.

¶ 57    The second half of the prejudice showing is trivial: If the gun had been suppressed, then for all practical purposes, this case would have been over. As for the first half, the question is whether defendant's motion would have prevailed had counsel established the pertinent facts about the search of the car and the seizure of the gun at the suppression hearing. We take those facts to be as Officer Matariyah conveyed them in his trial testimony. See *People v. Hopkins*, 235 Ill. 2d 453, 473 (2009) (court may consider trial evidence in reviewing suppression issue); *People v. Stewart*, 104 Ill. 2d 463, 480 (1984) (same). Ultimately, the issue is whether defendant can show that Officer Matariyah lacked probable cause to search the car and, more specifically, the gym bag where the gun was found.

¶ 58    Speaking to the issue of probable cause, Officer Matariyeh testified at the suppression hearing that, as he first approached defendant's car, he saw the front passengers—defendant and Raybon—making a lot of "sudden" hand movements. Based on his "training and experience," it appeared to him that "some type of contraband was being stashed away somewhere, it was being hidden." After instructing the passengers to roll down the windows, Officer Matariyeh smelled burnt cannabis. He further instructed the passengers to stop moving and remain still for the duration of the stop. Yet when he returned to his squad car to run defendant's license, he saw people in the car continuing to make "sudden movements."

¶ 59    Taking Officer Matariyeh's testimony as credible, for the time being, we find that it was more than sufficient to establish probable cause for the search. For one, our supreme court has held that the smell of burnt cannabis in a car, even without any corroborating evidence, gives an officer probable cause for a search. *People v. Stout*, 106 Ill. 2d 77, 87 (1985).

¶ 60    Defendant argues that *Stout* and cases following it are no longer good law and should not be followed here, because the search took place after cannabis was partially decriminalized. At the time of the stop, possession of less than 10 grams of cannabis was no longer a criminal offense but rather a civil violation, subject to a fine. Ill. Gen. Assembly, Pub. Act 99-697, § 40 (eff. July 29, 2016); see 720 ILCS 550/4(a)(1) (West 2016); 720 ILCS 550/4(a), (b) (West 2014). Thus, defendant argues, the smell of cannabis no longer indicated criminal activity. And so it did not provide probable cause for searching the car.

¶ 61    Our supreme court rejected this argument as "fatally flawed" in *Hill*, 2020 IL 124595, ¶¶ 27-31, a case that arose, like this one, after the possession of small amounts of cannabis had been decriminalized, but before it was legalized. As the supreme court explained, during the period of partial decriminalization, it was still "unlawful" or "illegal" to possess cannabis, even though the penalty for possessing less than 10 grams had been reduced to a "civil law violation." *Id.* ¶¶ 29, 31. (Not to mention that possessing more than 10 grams remained a criminal offense. See *In re O.S.*, 2018 IL App (1st) 171765, ¶ 29.)

¶ 62    For purposes of the fourth amendment, and the automobile exception to the warrant requirement in particular, "contraband" includes "all items that are unlawful to possess, regardless of the accompanying penalty." *Hill*, 2020 IL 124595, ¶¶ 28-29; see *Carroll v. United States*, 267 U.S. 132, 154 (1925). Thus, partial decriminalization "did not alter the status of cannabis as contraband." *Hill*, 2020 IL 124595, ¶ 31. Which means, in turn, that it did not alter

the "probable cause determination regarding cannabis," either. *Id.* ¶¶ 26, 35-36. The smell of cannabis, or other indicia of its presence, still supported probable cause for a search. See *id.* ¶¶ 35-36.

¶ 63    The defendant in *Hill*, 2020 IL 124595, ¶¶ 15-18, asked the supreme court to overrule *Stout*, 106 Ill. 2d 77, which, as we noted above, held that the smell of burnt cannabis gave rise to probable cause to search a car. The court in *Hill* concluded that it did not need to revisit *Stout* to resolve the case; because the officer in *Hill* relied on more than just the smell of cannabis, the case was factually distinguishable from *Stout*, and for that reason, the court declined the invitation to overrule *Stout*. *Hill*, 2020 IL 124595, ¶¶ 15-18.

¶ 64    Thus, *Stout* remains good law that we are bound to apply—at least to cases like this one, based on an incident in October 2016, after cannabis was partially decriminalized but before it was (partially) legalized. *People v. Rowell*, 2021 IL App (4th) 180819, ¶¶ 26, 28 (after *Hill*, "*Stout* remains good law and binding precedent" and "was in force in 2017 at the time of the search in this case.").

¶ 65    To be sure, the more recent development of *legalization* is a different matter. See Ill. Gen. Assembly, Pub. Act 101-27, Art. 10 (eff. June 25, 2019) (creating Cannabis Regulation and Tax Act and legalizing possession of certain amounts of cannabis under certain circumstances). Nothing we have said here should be taken to imply that the smell of cannabis alone will continue to provide probable cause to search a car now that cannabis has been legalized to some extent. We will, no doubt, face that question in due course. But not here. For our purposes here, *Stout* remains binding precedent, and under *Stout*, the smell of burnt cannabis, if nothing else, gave Officer Matariyeh probable cause to search defendant's car.

¶ 66    In any event, as in *Hill* and unlike in *Stout*, the search here was justified by more than just

the smell of burnt cannabis. In particular, the passengers in the front of the car made "sudden" and persistent hand movements—even after the officer told everyone to sit still for the duration of the stop.

¶ 67    Speaking to this issue, Officer Matariyeh did not just baldly describe these movements as "furtive," as defendant suggests. (In all fairness, the term was first suggested by the prosecutor, not the officer.) That characterization, on its own, is indeed vague, uninformative, and generally worthless. *United States v. Broomfield*, 417 F.3d 654, 655 (7th Cir. 2005). After all, "furtive" is nothing more than a synonym of "suspicious," and trading one synonym for another does nothing to explain the *basis* for the officer's claimed suspicions.

¶ 68    But here the officer said more: Given how the front passengers kept darting their hands about—repeatedly making "sudden" "hand movements," as he said—it looked to him, based on his training and experience, like they were trying to stash something out of sight. This belief was not unlike the officer's belief in *Hill*, 2020 IL 124595, ¶ 35, that the defendant's delay in pulling over was indicative of an attempt to hide contraband.

¶ 69    To be clear, we are not saying that these movements alone would have justified a search of the car. (Or that hand movements will always contribute to a finding of probable cause.) But here, when the officer also claimed to smell burnt cannabis, and when the officer specifically told the passengers to sit still, this persistent conduct did give him further reason to believe that he would find cannabis in the car if he searched for it, even if he did not see any apparent stray bits of cannabis, ashes, or other corroborating evidence in plain view. As in *Hill* (*id.*), the apparent attempt to hide something from the approaching officer further supports a finding of probable cause.

¶ 70    Defendant's attempt to distinguish *Hill* in his reply brief thus fails, for two reasons that

should already be evident. To recap: First, because *Stout* remains binding precedent, the officer had probable cause for a search, even if there was nothing but the smell of burnt cannabis to go on. Second, while it is true, as defendant says, that *Hill* did not find probable cause based on the smell of cannabis alone, the justification for the search was not so limited here, either. In *Hill*, the officer could rely on the smell of cannabis, the apparent attempt to stash something out of sight during the delay in pulling over, and a "loose 'bud' on the backseat." *Id.* Here, the first two factors, or something very similar to them, are also present. The main difference is that Officer Matariyeh did not see any loose cannabis in the car. To this extent, there was less to go on than in *Hill*. But that fact alone is of little help to defendant. For the reasons we have given, Officer Matariyeh's observations, while falling somewhat short of those in *Hill*, were enough to establish probable cause for a search of the passenger compartment and any unlocked containers within in—like the gym bag on the back seat—where cannabis could have been stashed.

¶ 71    In short, Officer Matariyeh's observations satisfied the "flexible, commonsense standard" for probable cause—an objectively reasonable belief that there was a "reasonable probability" of finding contraband in the car. *Id.* ¶¶ 23-24. Taking the officer's testimony as credible, we must conclude that defendant's motion to suppress would not have prevailed.

¶ 72    Defendant argues, however, that Officer Matariyeh's testimony was *not* credible. It bears repetition, to start, that defendant's burden is a "stringent" one: He must show that his motion to suppress, if competently litigated, "would have succeeded." *Henderson*, 2013 IL 114040, ¶ 12.

¶ 73    Under the less demanding standard that our supreme court rejected in *Henderson*, which required only a reasonable probability of prevailing on the motion, it may have been enough for defendant to point out, as he does, that the suppression hearing presented a credibility contest between the officer, on the one hand, and defendant and his witness, Driver, on the other. (Or as

defendant puts it, he and Driver "rebutted" the officer's testimony about the smell of cannabis and the sudden movements of the front passengers.) But at most, the presence of a credibility contest shows that defendant *might* have prevailed on his motion; without more, it cannot show definitively that he *would* have prevailed.

¶ 74 Nor is it enough, under the demanding standard adopted in *Henderson*, to point out some minor aspects in which the officer's testimony was less than fully unassailable. Again, that *might* swing the credibility contest in defendant's favor, but a possibility, even a reasonable probability, of prevailing in that contest, is not enough. Rather, defendant must show definitively that the trial judge—not this particular trial judge, but a reasonable trial judge, generally speaking—*would have* rejected the officer's testimony. (As defendant puts it, the prejudice inquiry is an objective one, "unmoored" from the particular judge trying the case.) Or in other words, that the testimony was so inherently implausible or unreliable that a reasonable judge would be bound to reject it.

¶ 75 To this end, defendant offers a mix of considerations meant to show that the officer was lying and/or unable to reliably identify the smell of burnt cannabis. We are not convinced that the officer's testimony must be rejected on any such basis.

¶ 76 For instance, defendant paints the officer's testimony as a tall tale involving a mysterious "ever-strengthening smell"—a smell of burnt cannabis, in other words, that seemed to intensify as the stop progressed. What's more, he says, the officer did not find any cannabis or related paraphernalia in the car, so he could not claim that the smell intensified as he homed in on its source.

¶ 77 The absence of cannabis or paraphernalia does not show that the officer was lying or even mistaken that the smell was that of burnt cannabis. To take just one example, defendant and/or other passengers could have smoked cannabis in the car sometime earlier, thus consuming

their entire stash and requiring no paraphernalia to do so. Or they could have smoked it right before they got into the car, in which case the smell may have lingered on their clothes without leaving any traces of cannabis in the car. That could even be the case if, as defendant allegedly told the officer, they had been around other people who were smoking before getting into the car. Notably, none of these possibilities—not even the last, seemingly innocent explanation—would defeat the officer's probable cause for a search, based on the perceived smell of burnt cannabis. See *Hill*, 2020 IL 124595, ¶ 24 (probable cause does not require officer's belief to be proven correct, nor does it require officer to rule out "innocent explanations for suspicious facts").

¶ 78     As for the supposedly "ever-strengthening" smell of cannabis, defendant's description of the officer's testimony is a misleading caricature. What Officer Matariyeh actually said is that he first noticed the smell of cannabis coming from somewhere inside the car when the windows were rolled down at his direction. Later, while searching the passengers outside of the car, he noticed a "very strong" smell of cannabis on *them*—thus implying that the smell was lingering on the passengers themselves more than wafting through the cabin of the car, an observation he could only make after he got closer to the passengers while searching them. We see nothing in this account that discredits the officer or his testimony.

¶ 79     Defendant further argues that Officer Matariyeh was not qualified to determine that the smell was that of burnt cannabis, because he lacked the training and experience necessary for this purpose.

¶ 80     Defendant does not dispute that "distinctive odors can be persuasive evidence of probable cause" and that an officer may establish probable cause by "detect[ing] controlled substances by their smell." *Stout*, 106 Ill. 2d at 87. Indeed, "a trained and experienced police officer" may rely entirely on his perception of the smell of cannabis in determining that there is probable cause to

search a car. *Id.* at 88.

¶ 81    But in defendant's view, Officer Matariyeh's background "fares poorly" in comparison to officers in other cases whose claims to smell cannabis were deemed credible and reliable. For example, in *Stout* (*id.* at 81-82), the officer testified that he had previously smelled substances confirmed to be cannabis "on numerous other occasions" during his seven-year career. *Id.* at 81-82. And in *People v. Smith*, 2012 IL App (2d) 120307, ¶¶ 2, 18, the officer estimated that he had smelled burnt cannabis about 200 times and fresh cannabis more than 100 times.

¶ 82    Here, Officer Matariyeh had only been on the force for approximately "1 ¾ years," and when counsel asked whether he could recognize the smell of burnt cannabis from his "training at the academy," he answered, "[t]hrough my experience on the job more so." In that capacity, he testified, he had "experienced both burnt and the smell of fresh cannabis and distinguished between the two," though, as defendant emphasizes, he never said how many times he had done so. But then again, counsel never asked.

¶ 83    Defendant would have us declare that Officer Matariyeh was categorically unqualified, on this basis, to reliably determine that what he smelled was burnt cannabis. In *Stout*, 106 Ill. 2d at 87, the supreme court refused to establish a bright-line threshold for the "number of training hours or employment years necessary to render an officer's belief reliable" enough to establish probable cause. Rather, that determination is made on a case-by-case basis, taking the officer's "skill and knowledge" into account, along with any other factors that may have been present that would also help to establish probable cause. *Id.* In other words, the more corroborating evidence, the less "skill and knowledge" the officer must demonstrate. (Though it bears emphasis, again, that probable cause may be established without *any* corroborating evidence at all.)

¶ 84    We would add, as a general matter, that recognizing the smell of burnt cannabis is not a

particularly esoteric skill that can only be acquired through extensive, specialized training or a mastery of sophisticated scientific or forensic techniques. See *Smith*, 2012 IL App (2d) 120307, ¶ 17 (declining to treat the smell of cannabis as a form of scientific knowledge or evidence).

¶ 85    Viewed against this backdrop, we don't think the officer's credentials fared quite as poorly as defendant would have us believe. Although the officer's testimony was somewhat thin, he did make clear that he was not a newcomer—he was familiar with the smell of cannabis (and, for what it's worth, the difference between fresh and burnt cannabis) from his time on the force. As for his training, he didn't quite say that he had *none*, as defendant interprets his testimony, but rather that his on-the-job experience had been the more significant factor in teaching him to recognize the smell of cannabis. And in any event, we don't take *Stout* to *require* specialized training in the smell of cannabis; any combination of training and/or on-the-job experience that imparts the ability to recognize this distinctive smell will suffice.

¶ 86    There is no need to put too fine a point on this particular topic. Suffice it to say that we are confident of this much: Whatever glancing blows defendant may land in this argument, he has not come close to showing, definitively, that a reasonable judge would reject the officer's testimony as unreliable—especially when there was some corroborating evidence, namely, the front passengers' apparent efforts to stash something out of sight, that further supported a finding of probable cause for the search.

¶ 87    Similar remarks apply to defendant's final argument. He contends that the officer's report casts doubt on his credibility and reliability, because he wrote in his report that he "seemed to" smell cannabis, whereas he showed no such hesitation in his testimony. (The trial court sustained the State's objection to this line of questioning, finding that it was not impeaching. Defendant argues that we should consider this "related error" in assessing the officer's credibility.) At most,

this might amount to a minor impeachment, and it falls far short of establishing that the officer's testimony did not credibly establish probable cause for the search.

¶ 88 In light of these conclusions, we need not consider the State's alternative argument that defendant consented to the search of his car. Defendant has failed to show that he carried his burden on the motion and would have succeeded in having the gun suppressed, if not for counsel's failure to elicit the necessary evidence of the scope and fruits of the search.

¶ 89                                         III. Double enhancement

¶ 90 The AHC statute prohibits the possession of a firearm by a person with at least two prior convictions for certain qualifying offenses, including any forcible felony, such as robbery, as well as UUWF. 720 ILCS 5/24-1.7(a)(1)-(2) (West 2018); see *id.* § 2-8. Here, defendant's two prior convictions, for robbery and UUWF, were used to satisfy the "qualifying offenses" requirement. Thus, his prior convictions were elements of his AHC offense, as was the fact that he possessed a firearm.

¶ 91 An element of the defendant's offense generally may not be used as an aggravating factor in sentencing for that offense. *People v. Phelps*, 211 Ill. 2d 1, 11-12 (2004). This is known as the rule against "double enhancement," and whether a sentence is based on a double enhancement is a question of law we review *de novo*. *Id.* at 12.

¶ 92 Defendant argues that the trial court "repeatedly cited" both his possession of a gun and his two qualifying convictions. And the trial court evidently relied on these elements, defendant says, because he did not have any other prior convictions and, more generally, there was "no evidence in aggravation" at all. Hence, the trial court had no legitimate basis for imposing a sentence above the statutory minimum. In other words, the only possible explanation for his above-the-minimum sentence is an improper double enhancement.

¶ 93    Defendant's argument fails for two reasons, one legal and one factual. First, the legal reason: Our supreme court has held that consideration of a defendant's criminal history in fashioning a sentence within the applicable statutory range does not count as an "enhancement" in the sense prohibited by the rule. *People v. Thomas*, 171 Ill. 2d 207, 224-25 (1996).

¶ 94    In *Thomas*, the supreme court rejected a double-enhancement challenge in the context of mandatory Class X sentencing, pursuant to the general-recidivism provisions of the Code of Corrections. Thomas was convicted of a Class 1 felony, but since he had two prior Class 2 felony convictions, he was subject to a mandatory Class X term, within the range of 6-30 years. *Id.* at 210; see 730 ILCS 5/5-5-3(c)(8) (West 1992) (now found at 730 ILCS 5/5-4.5-95(b) (West 2016)). In sentencing Thomas to the intermediate range of 15 years, the trial court expressly considered his criminal history—and only his criminal history—as a statutory aggravating factor. *Thomas*, 171 Ill. 2d at 210, 225; *People v. Thomas*, 266 Ill. App. 3d 870, 881 (1994) (qualifying offenses "were the only factors in aggravation" cited by trial court); see 730 ILCS 5/5-5-3.2(a)(3) (West 1992) (trial court may consider defendant's criminal history as a "reason[ ] to impose a more severe sentence").

¶ 95    Thomas argued on appeal that his criminal history had already been used to enhance his offense from a Class 1 to a Class X, and thus to consider his criminal history *again* in sentencing him above the Class X minimum was a double enhancement. The supreme court disagreed and held that considering a defendant's criminal history as an aggravating factor did "not involve a double enhancement," and, indeed, was "not properly understood as an enhancement" of any kind. *Thomas*, 171 Ill. 2d at 224-25. Rather, "the discretionary act of a sentencing court in fashioning a particular sentence tailored to the needs of society and the defendant, within the available parameters, is a requisite part of every individualized sentencing determination." *Id.*

¶ 96 The supreme court explained that a trial court has "a constitutionally mandated duty to assess defendant's rehabilitative potential" and to fashion a sentence "tailored to the needs of society and the defendant, within the available parameters." *Id.* at 224-25, 229. Because a sentencing judge must be allowed to consider a defendant's entire criminal history for this purpose, the trial court had properly " '*re*considered' [the] two prior convictions" that were used to qualify Thomas for a Class X sentence. (Emphasis added). *Id.* at 229.

¶ 97 To be sure, those prior convictions could not be used to increase the *applicable range* a second time, for example, by subjecting Thomas to an extended-term sentence—*that* would be an improper double enhancement. See *id.* at 225 (distinguishing *People v. Hobbs*, 86 Ill. 2d 242 (1981)). But a rule that prohibited the sentencing judge from considering a defendant's criminal history, for the purpose of imposing a sentence *within* the enhanced range, would force the judge "to ignore factors relevant to the imposition of sentence" (*id.* at 227 (quoting *Saldivar*, 113 Ill. 2d at 268)), factors the judge is constitutionally required to consider (*id.* at 229). The rule against double enhancement, the supreme court cautioned, must not be "rigidly applied" to "impede" that "entirely proper" exercise of a trial court's sentencing discretion. See *id.*

¶ 98 We recognize that in *Thomas*, the qualifying offenses were used to enhance the applicable sentencing range for the underlying offense, whereas here, the qualifying offenses enhanced the crime itself, turning what otherwise would have been a lesser gun possession charge (for instance, aggravated unlawful use of a weapon) into the more serious Class X felony of being an AHC. But for purposes of the rule against double enhancement, this is a distinction without a difference. Either way, the question is whether prior convictions that subject a defendant to enhanced punishment can also be considered as aggravating factors that affect the sentence imposed within the enhanced penalty range. Our supreme court answered yes in

*Thomas*, and that holding forecloses the argument that defendant makes here.

¶ 99    Thus, even if defendant is correct that the trial court considered his qualifying convictions for the purpose of choosing an appropriate sentence within the Class X range, there was still no double enhancement, at least not to this extent. The only question would be whether the court considered the remaining element of AHC—the bare fact that defendant possessed a gun—as an aggravating factor.

¶ 100   But as a factual matter, we do not agree that the trial court increased defendant's sentence based on *either* his offense history *or* his possession of a gun. Rather, these facts were incidental to the trial court's reason for giving defendant an above-the-minimum sentence: As the State argued in aggravation, defendant had twice received minimum sentences, and neither time was he deterred from further criminal activity.

¶ 101   Arguing in aggravation, the State noted that defendant was "given the minimum"—that is, probation—in his 2005 robbery case. In 2013, after he was convicted of UUWF, he "got the minimum again"—three years in prison for a Class 2 offense. See 720 ILCS 5/24-1.1(e). And while on "mandatory supervised release, defendant was charged in this case with AHC. As the State emphasized, "[e]ven on parole after being incarcerated for three years he's still possessing guns." Thus, "[w]e just don't feel the minimum six years is an appropriate sentence. He already got the minimum two times. He was given an opportunity." And for that reason, the State requested "that he be sentenced beyond the minimum in this case."

¶ 102   After hearing defendant's evidence in mitigation, which we need not dwell on for our purposes here, the trial court largely retraced the prosecutor's steps. As the court observed, "[i]n 2006 you were convicted of a robbery and you were given probation. That is an opportunity or chance." And then there was the UUWF, for which defendant "was given three years." The court

did not explicitly note that this was the mandatory minimum sentence, but as we said above, the State had already made that point.

¶ 103   After completing his prison term, the court continued, defendant appeared to be "doing everything right." But then, "for some reason or another you were in possession of a firearm." And so "now here we are again."

¶ 104   The court acknowledged the difficult task of "trying to impose a sentence in a case so delicate such as yours," where there was, on the one hand, substantial mitigating evidence that favored a lighter sentence, but also, on the other hand, a legitimate argument, made by the State, that "you don't deserve the minimum because you had been given probation, you were given the minimum once before." (Twice before, actually.) Taking all of these factors into account, and considering the 6-30 year range for a Class X offense, the trial court settled on a sentence of 7 years, a minor one-year increase from the statutory minimum.

¶ 105   As we read the record, the trial court thus based defendant's sentence on the fact that minimum sentences had already proven insufficient to deter him from further criminal activity. That is not a double enhancement or improper aggravation of any other kind. It is an entirely reasonable sentencing consideration, in light of which the trial court imposed an entirely reasonable sentence, given the applicable statutory range. We find no sentencing error and thus need not consider the parties' respective forfeiture and plain-error arguments.

¶ 106                                    CONCLUSION

¶ 107   For these reasons, we affirm defendant's conviction and sentence.

¶ 108   Affirmed.